**In Re: Petition for Formation of INDEPENDENT SCHOOL DISTRICT.**

**Appeal of: Riegelsville Tax and Education Coalition.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2010.

Decided April 13, 2011.

---

William H.R. Casey, Doylestown, and James G. Sweeney, Goshen, NY, for appellant.

David F. Conn, New Britain, for appellee Palisades School District.

Alan B. McFall, Bangor, for appellee Easton School District.

Mary P. Fullerton, Harrisburg, for amicus curiae Department of Education.

BEFORE: COHN JUBELIRER, Judge, and LEAVITT, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge LEAVITT.[1]

The Riegelsville Tax and Education Coalition is a nonprofit corporation formed to

---

1. The case was reassigned to this author on December 1, 2010.

promote the advancement of quality education in the Borough of Riegelsville. At present, Riegelsville, which is located in the northeast corner of Bucks County, is split between the Easton School District in Northampton County and the Palisades School District in Bucks County. The Coalition petitioned to have the entire borough placed into the Palisades School District, which is contiguous to the entire borough. By contrast, Easton is not contiguous to any part of Riegelsville, except for its "island" in eastern Riegelsville. The Court of Common Pleas of Bucks County denied the Coalition's petition because the Secretary of Education found that the Coalition's proposal lacked merit from an educational standpoint. The Secretary reasoned that in the interest of diversity, the eastern half of Riegelsville should remain a part of the Easton School District. Concluding that the Secretary misapprehended and misapplied the applicable statutory law, we vacate and remand.

### Background.

Sixty children living in Riegelsville travel 10 miles each way to attend schools in the Easton School District, in Northampton County. The Riegelsville children pass through another Northampton County school district, Wilson, before reaching Easton. It is an historical accident that these 60 children attend school in the Easton School District, and not Wilson or Palisades, both of which are contiguous to Riegelsville. At one time, Riegelsville had its own school and district. In 1932, when the Riegelsville School Council sought a high school for its older students, it had two options: the high school in Easton, 10 miles away, or the high school in Doylestown, 25 miles away. The School Council chose Easton High School. In 1963, the General Assembly enacted the School Re-

organization Act[2] to reduce the number of school districts in Pennsylvania from 1500 to 500. In that reorganization, the Riegelsville School District was folded into the Easton School District. Riegelsville children continued to attend elementary school in Riegelsville and high school in Easton. This changed in 1975, when Easton closed the Riegelsville elementary school.

In the meantime, the Palisades School District was formed in rural Bucks County, immediately west and south of Riegelsville. In 1968, Riegelsville annexed a large tract of land in an adjacent township located in the Palisades School District. The Palisades School District now covers the entire northeast corner of Bucks County, with the exception of the eastern half of Riegelsville. The Riegelsville children assigned to Palisades travel a shorter distance to reach school than the Riegelsville children assigned to Easton.

In March of 2007, the Coalition filed a petition with the Court of Common Pleas of Bucks County (trial court) to have all of the Borough of Riegelsville placed into the Palisades School District. The Coalition offered several reasons for the transfer request. They included

> educational benefits for the school children, including elimination of the necessity of traveling through another school district in Northampton County to reach the Easton District, a desire to be in a contiguous school district with their Riegelsville neighbors in Bucks County, and because of unequal tax treatment from the Easton School District.

Coalition Petition, ¶ 9.

After finding that the Coalition's petition had the support of the majority of affected residents, the trial court referred the petition to the Secretary of Education, who

2. Act of August 8, 1963, P.L. 564, commonly known as the School Reorganization Act.

sent a letter to the trial court in January 2008. The Secretary's letter stated, in relevant part, as follows:

1. The information submitted establishes that petitioners seek to transfer a portion of Riegelsville Borough from the Easton Area School District to the Palisades School District.

2. The information submitted does not establish that the school districts provide unacceptable academic programs and/or learning environments.

3. There is no educational benefit to the proposed transfer.

For these reasons, I find that the proposed transfer lacks merit from an educational standpoint.

Department Record, Item No. 12. Upon receipt of this letter, the trial court denied the Coalition's petition.

The Coalition appealed to this Court, arguing that it had been denied due process because the Secretary's determination was a final order and, as such, governed by the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704.[3] We agreed. We vacated the trial court's order and remanded the matter "in order that the trial court may secure a proper adjudication from the Secretary regarding the merits of the [p]etition from an educational standpoint." *In Re: Petition for Formation of Independent School District*, 962 A.2d 24, 28 (Pa. Cmwlth.2008) (*Riegelsville I*).

On remand, the trial court conducted an evidentiary hearing and upon completion, transmitted the evidentiary record to the Secretary. The Secretary issued a second adjudication but this time with findings of fact and conclusions of law. The Secretary again held that the Coalition's petition lacked merit from an educational standpoint. The Secretary found the academic programs of Easton and Palisades to be in general parity with each other. Given that finding, the Secretary reasoned that the Coalition's petition should be denied because there were no "compelling or unusual reasons for the transfer." Adjudication, 10/26/09 at 16. The Secretary also found that the racial diversity in the Easton elementary school attended by Riegelsville children would be "negatively impacted" by the transfer. *Id.* at 11. It was also preferable, he believed, for the Riegelsville children to stay in the Easton schools where they would learn to "interact with individuals of varying backgrounds and experiences." *Id.* at 17.[4] The trial court again denied the Coalition's petition, and the Coalition petitioned for this Court's review.

On appeal, the Coalition raises three issues. First, it contends that the Secretary used the wrong standard for evaluating the educational merits of the proposed transfer. Second, it contends that the Secretary capriciously disregarded uncontradicted evidence that the Riegelsville children would benefit educationally from the transfer. Third, it contends that the Secretary exceeded the scope of his statutory authority in holding that racial and social-economic diversity were considerations relevant to his review of the Coalition's petition.

### The Public School Code.

We begin with a review of the applicable statutory law, which is found in the Public

---

3. Specifically, the Secretary's conclusory findings lacked the requisite findings of fact and conclusions of law required by Section 507 of the Administrative Agency Law. It states:

All adjudications of a Commonwealth agency shall be in writing, shall contain findings and the reasons for the adjudication, and shall be served upon all parties or their counsel personally, or by mail.
2 Pa.C.S. § 507.

4. There were no findings of fact about "varying backgrounds and experiences" of the student population in either Palisades or Easton.

School Code of 1949, Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101–27–2702. Section 242.1 governs the "Establishment of independent districts for transfer of territory to another district." 24 P.S. § 2–242.1. Subsection (a) set forth the procedures for transfer, and it states, in relevant part, as follows:

(a) A majority of the *taxable inhabitants of any contiguous territory in any school district* or school districts ... may present their petition to the court of common pleas ... asking that the territory be established as an independent district for the sole purpose of *transfer to an adjacent school district contiguous thereto....* Such petitions shall set forth a proper description of the boundaries of the territory to be included in such independent district, and the reasons of the petitioners for requesting such transfer to another school district and the name of the district into which its territory is proposed to be placed.

The court shall hold hearing thereon.... *In all cases where an independent district is proposed for transfer from one school district to another, the merits of the petition for its creation, from an educational standpoint,* shall be passed upon by the [Secretary of Education] *and the petition shall not be granted by the court unless approved by him.* The court of common pleas shall secure the reaction from the [Secretary of Education] upon receipt of the petition properly filed.

The court, in its decree establishing such independent school district for transfer purposes, shall also determine the amount, if any, of the *indebtedness and obligations of the school district, from*

*whose territory such independent district is taken,* that said district shall assume and pay, and, a statement prorating the State subsidies payable between or among the losing district or districts and the receiving district....

24 P.S. § 2–242.1(a) (emphasis added).[5] The first step in moving a neighborhood, or "contiguous territory," from one school district to another is obtaining the agreement of the majority of the "taxable inhabitants" in that territory. The next step is the creation of an "independent school district" for the petitioning contiguous territory. The final step is the transfer of the independent school district into a contiguous school district, which is the one preferred. by the independent district's taxable inhabitants.

The establishment of an independent school district is procedurally unusual because it must be acted upon both by a court of common pleas and by state agencies. A petition for the formation of an independent school district is presented first to the court of common pleas where the taxable inhabitants reside. The trial court determines the precise boundaries of the proposed independent school district; that a majority of taxable inhabitants in the "contiguous territory" have, in fact, signed the petition; that the petitioners have listed reasons for the transfer; and that the petition names the school district into which the territory is proposed to be transferred. If the petition survives this review, the trial court refers the petition to the Secretary of Education to determine whether the petition has merit "from an educational standpoint." Section 242.1(a) of the School Code, 24 P.S. § 2–242.1(a). If the Secretary does not approve the petition, the trial court *must* deny it and the

**5.** Section 242.1 was added to the Public School Code by the Act of June 23, 1965, P.L. 139.

proceeding ends. *Id.* If the Secretary approves the petition, the trial court establishes an independent school district and refers the matter to the State Board of Education for a final review.[6] If the State Board approves, then the independent school district is merged into the other existing school district.

In this case, the Coalition's petition survived round one of the statutory procedure. However, it could not move to round two, *i.e.*, the establishment of an independent school district, because of the Secretary's adjudication, which functioned as a veto on the petition. Under Section 242.1 of the Public School Code of 1949, the trial court had no choice but to disapprove the petition upon receipt of each disapproval by the Secretary.

### The Remand Order.

When the Secretary initially received the Coalition's petition from the trial court, he, reasonably enough, referred the matter to staff for an investigation. Questionnaires were sent to the Easton and Palisades districts. Easton, not eager to lose its Riegelsville tax base, opposed the petition. Palisades, when informed by its business manager that the transfer had the potential to affect its state subsidy adversely, also opposed the petition. The Coalition responded to the Secretary's inquiry by noting that taxes in Riegelsville were unequal; that the Borough children

would benefit from going to the same schools; that the children's 10–mile commute to Easton along a narrow road next to the Delaware River was perilous; and that the transfer would place the children into a "Blue Ribbon" School District, a recognition not enjoyed by Easton. At the conclusion of his investigation, the Secretary sent his January 2008, letter, quoted above, to the trial court disapproving the Coalition's petition.

Up to that point, the Secretary acted as an administrator, not an adjudicator. He was not required by the Public School Code to hold a hearing before making his decision on the Coalition's petition. Functionally, his review was no different from the review conducted by state agencies daily. A simple example is the Pennsylvanian who applies for a driver's license. The Department of Transportation staff who process the application do so as administrators, not adjudicators. It is only when a citizen, with standing, objects to the staff decision that the agency must conduct an adjudicatory hearing that comports with the Administrative Agency Law.[7]

■ What the Secretary should have done, before communicating his decision to the trial court, was advise the Coalition and the school districts of his decision. In the interest of fairness, the Secretary should have also advised the Coalition of

---

**6.** The State Board's involvement is governed by Section 293.1 of the School Code, added by the Act of June 23, 1965, P.L. 139, *as amended*, 24 P.S. § 2–293.1. It states:

When a court decree is received creating an independent district for transfer purposes, the State Board of Education shall place such item on its agenda and either approve or disapprove the creation and transfer. If approval is given, the board shall direct the Council of Basic Education to make the necessary changes in the county plan. If disapproved, the board shall state its rea-

sons for such disapproval and the independent district shall be provided a hearing if it so desires.

24 P.S. § 2–293.1.

**7.** Sections 504, 505 and 506 of the Administrative Agency Law, 2 Pa.C.S. §§ 504, 505, 506, govern the holding of a hearing, receipt of evidence and submission of briefs. In addition, administrative proceedings are governed by the General Rules of Administrative Practice and Procedure, 1 Pa.Code §§ 31.1–35.251.

its right to a formal administrative hearing. Simply, until the Coalition had that hearing with the opportunity to examine and cross-examine witnesses, including the staff that did the investigation of the Coalition's application, the Secretary lacked authority to issue a final order, or adjudication, disapproving the Coalition's effort to unify Riegelsville into one school district.

The Pennsylvania Supreme Court's decision in *Canonsburg General Hospital v. Department of Health*, 492 Pa. 68, 422 A.2d 141 (1980) is instructive of these principles. In that case, the Department of Health refused to approve Canonsburg's plan to build a new hospital, and that decision was communicated to Canonsburg in a letter from the Secretary of Health. Rather than pursue an administrative hearing to challenge the Department's denial of its certificate of need, Canonsburg sought relief in a mandamus action. Canonsburg argued that a hearing before the Secretary was futile, inasmuch as the Secretary had made the decision to deny its expansion plan. The Supreme Court dismissed this logic, explaining that it would not presume the futility of an administrative hearing, which "will, if given a chance, discover and correct [the agency's]

own errors." *Id.* at 74, 422 A.2d at 145 (quotation omitted). *Canonsburg General Hospital* teaches that an administrative hearing conducted in accordance with the Administrative Agency Law is the appropriate mechanism to correct the mistakes of agency staff, even when the "staff" includes the agency head. That is the procedure to be followed here.

■ Because the Secretary's first adjudication lacked findings of fact, conclusions of law or any reasoning, this Court vacated it and ordered a remand. *Riegelsville I*, 962 A.2d at 28. The trial court construed this remand order to mean that it was to conduct the evidentiary hearing on which the Secretary would base his findings. The trial court's confusion was understandable given the complicated statutory procedure for the establishment of an independent school district. However, the trial court erred. An Article V judge can never act as an administrative law judge for the head of a state administrative agency.[8] What the trial court should have done was return the Coalition's petition to the Secretary, directing the Secretary to conduct a hearing in accordance with the Administrative Agency Law.[9]

---

**8.** Article V of the Pennsylvania Constitution establishes the judicial branch in Pennsylvania. The judiciary does not serve, and is not in any way a part of, the executive branch. It is well settled that under the doctrine of separation of powers, no branch of the government is permitted to exercise the "functions exclusively committed to another branch." *Jubelirer v. Rendell*, 598 Pa. 16, 41, 953 A.2d 514, 529 (2008).

**9.** In *In re Weaverland Independent School District*, 378 Pa. 449, 456, 106 A.2d 812, 815 (1954), the Supreme Court observed that the Secretary did not have to hold a hearing because the Public School Code of 1949 did not explicitly require it. This is correct but irrelevant. First, *Weaverland* was decided in 1954 before the United States Supreme Court's seminal decision in *Goldberg v. Kelly*,

397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which ushered in the due process revolution in administrative practice and procedure. *See*, Gedid, John L., "Procedural Due Process in Pennsylvania: How the Commonwealth Court Clarified an Ambiguous Concept," 20 Widener L.J. 25 at 28 (2010). Second, since *Weaverland*, it has been clarified that the Administrative Agency Law functions as the default hearing statute where a hearing is not expressly provided for in the underlying substantive statute. *Turner v. Public Utility Commission*, 683 A.2d 942, 946 (Pa.Cmwlth. 1996). Finally, *Weaverland* did not address the issue of whether a Secretary's decision on educational merit is, or is not, an adjudication. In *Riegelsville I*, this Court considered that issue and held that the Secretary's determination was an adjudication subject to the

The record made before the trial court focused on comparing the educational opportunities offered by Easton and Palisades. The evidence showed, generally, that the outcomes at Palisades are superior; math and reading scores are higher; the drop-out rate is lower; and more high school graduates of Palisades attend college. The Secretary so found in his second adjudication, based on the record transmitted from the trial court. The Secretary concluded, however, that the Coalition's petition lacked educational merit because there was more opportunity for diversity in Easton. Nothing in the trial court's record even adverted to the racial or social-economic composition of either Palisades or Easton.

Procedurally, the second adjudication was flawed. First, as noted above, the Department of Education, not the trial court, should have developed the record, as in *Canonsburg General Hospital.* The trial court lacked jurisdiction to conduct an administrative hearing on behalf of the Department of Education. Second, the parties lacked notice of the Secretary's reasons for his disapproval, making their attempt at a record a shot in the dark. The Secretary's pre-adjudication determination should have presented the reasons for disapproval, so that the interested parties could have developed evidence relevant thereto. As it was, the parties had no idea that diversity was a concern of the Secretary, and, thus, did not address that issue either in their evidence or in their legal arguments.

In sum, the Secretary's second "adjudication" was not valid. It was not based on a record developed before the Department of Education at which all parties had advance notice of the relevant factual and legal issues. Accordingly, the Secretary's order must again be vacated.

requirements of the Administrative Agency Law.

### "Merits from an Educational Standpoint."

The Public School Code requires the Secretary of Education to "pass" upon the "merits" of a proposed independent school district "from an educational standpoint." Section 242.1(a) of the Public School Code, 24 P.S. § 2-242.1(a). In his first adjudication, the Secretary disapproved the petition for the stated reason that the Coalition did not show that Easton provided "unacceptable academic programs and/or learning environments." Department Record, Item No. 12. In his second adjudication, the Secretary found that the Coalition did not show "compelling or unusual reasons" for the transfer. The Secretary found that the educational outcomes, measured objectively, were better in Palisades than in Easton. Nevertheless, he refused to approve the petition on grounds of diversity. Both the Coalition and Easton assert that the Secretary has misunderstood his role in "passing" on a proposed transfer from one school district to another.

The Coalition objects to the Secretary's second adjudication as an essay on school engineering, not an evaluation of educational merit. The Secretary found Palisades to be academically superior to Easton, looking at test scores at every grade, the drop-out rate and college attendance data. That evidence should have disposed of the educational merit of the Coalition's proposed transfer. The Coalition also challenges the Secretary's conclusion that racial diversity will be served by keeping 60 children in a 9,000 person school district. The questionnaires provided by Easton and Palisades showed that both districts are predominantly white. Further, the Secretary's unfounded conclusion un-

fairly placed the Coalition under a cloud of suspicion that its petition may have been motivated by racial *animus.*

Easton took umbrage with the Secretary's findings that its educational programs do not compare favorably to those of Palisades. Whatever "from an educational standpoint" means, it does not, Easton argues, authorize the Secretary to undertake a comparison of the academic outcomes of the two affected school districts, a divisive and unnecessary exercise. Easton is an urban school district with challenges that Palisades, a rural school district, does not face. Palisades objected to the Coalition's petition because its business manager concluded that the addition of 60 children to its school population of 2,000 could adversely affect its state subsidy. Neither school district has offered a coherent interpretation of the term "from an educational standpoint;" rather, each has evaluated the Coalition's petition strictly in terms of its potential financial consequences.

The Public School Code of 1949 directs the Secretary to evaluate the "merits of [the] petition ... from an educational standpoint." Section 242.1(a) of the School Code, 24 P.S. § 2–242.1(a). The Public School Code does not define "merits ... from an educational standpoint" or any of the individual component words in that term.

The Secretary applied Section 242.1(a) as follows: as long as the school districts affected by the transfer are in "general parity" with each other academically, a petition for a change in school district will not be approved. Instead, a petition must present "compelling" reasons in order to demonstrate "merits from an educational standpoint." Further, a petition must advance racial and social-economic diversity to meet the statutory standard. There are several flaws in the Secretary's construction and application of the statutory standard, *i.e.,* "merits from an educational standpoint." [10]

**10.** Courts will defer to an agency's expertise where the agency evaluates and resolves conflicts in the evidence, particularly where the evidence is technical in nature. *Yi v. State Board of Veterinary Medicine,* 960 A.2d 864, 870 (Pa.Cmwlth.2008). However, "the meaning of [a] statute is a question of law for the court." *Connecticut General Life Insurance Company v. Pennsylvania Life and Health Insurance Guaranty Association,* 866 A.2d 465, 467 (Pa.Cmwlth.2005). Courts can defer to an agency's interpretation of the statute where that statute is ambiguous or relates to a complex subject, such as a technical tax question. *Tool Sales & Service Co., Inc. v. Board of Finance and Revenue,* 536 Pa. 10, 22, 637 A.2d 607, 613 (1993). Otherwise, the agency's interpretation "carries little weight," especially where it is wrong. *Office of Administration v. Pennsylvania Labor Relations Board,* 591 Pa. 176, 190 n. 11, 916 A.2d 541, 549 n. 11 (2007).

The dissent would defer to the Secretary in all cases to determine what "merits ... from an educational standpoint" means. This means the court would have to defer to the Secretary's "expertise" even if the Secretary applied different meanings in two identical cases, resulting in opposite outcomes. Indeed, the Secretary's adjudication in *Riegelsville* cannot be reconciled with the application of the statutory standard by other Secretaries in other adjudications, as noted *infra.*

The Secretary's "expertise" is irrelevant to the statutory construction issue. The Supreme Court has held, specifically, that "educational merit" is not a technical term or a term of art. *Weaverland,* 378 Pa. at 455, 106 A.2d at 815. The Court also held that "merits from an educational standpoint" is not vague. Notably, an ambiguous statute is one that can be read in two discrete ways, not many. *Velocity Express v. Pennsylvania Human Relations Commission,* 853 A.2d 1182, 1185 (Pa. Cmwlth.2004). In *Weaverland,* after finding "education merit" not to be a technical term, the Supreme Court held that the term must be given its ordinary meaning. Accordingly, it is for the court to construe that meaning.

First, we agree with the Coalition that the General Assembly did not give the Secretary an open-ended mandate to impose his social policy views upon the citizens of Pennsylvania.[11] For a statute to be constitutional, the legislature may delegate to an agency the authority to find whether a state of facts exists, but it cannot delegate the authority to make the basic policy choices. *Pennsylvania Builders Association v. Department of Labor and Industry*, 4 A.3d 215, 223–224 (Pa. Cmwlth.2010). It is the job of the legislature to establish the basic policy choices in the field of public education. Otherwise, the legislation would be unconstitutional. The laudable goal of racial and ethnic diversity cannot be read into the words actually used by the legislature in Section 242.1 of the Public School Code, *i.e.*, "merits from an educational standpoint."

Second, the Secretary erred in reading the statutory standard to require the applicant to present "compelling" or "unusual" reasons for a transfer. "Compelling" and "unusual" do not appear in Section 242.1. By adding these words, the Secretary made the statutory standard very difficult to satisfy. In effect, the Secretary transformed the word "merits" into "very great merits." It is error to add words to a statute not chosen by the legislature. *Vlasic Farms, Inc. v. Pennsylvania Labor Relations Board*, 734 A.2d 487, 490 (Pa. Cmwlth.1999).[12]

Further compounding this error, the Secretary, who did not explain why there were no compelling or unusual reasons for the Coalition's petition, then stated that he might have found a "compelling" reason, had the affected school districts agreed to the transfer. This was error because the findings on merits from an educational standpoint are for the Secretary to make, not the affected school districts. It may be appropriate to seek input from the districts, but their opposition is not dispositive, particularly where based upon economic considerations, not academic concerns.

Third, the Secretary suggested that the Coalition's petition lacked merit from an educational standpoint because the children to be transferred were not leaving a distressed or failing school district. Again, this is not a condition imposed by the legislature nor can it be read into the statutory standard.

This leaves us with the question of what "merits from an educational standpoint" means. The leading case on the construction of those words is *In re Weaverland Independent School District*, 378 Pa. 449, 106 A.2d 812 (1954). It addressed the meaning of "merits from an educational standpoint" and the extent of the Secretary's power to determine those merits. *Weaverland* necessarily informs our consideration of the statutory language.

---

11. The Secretary does not explain how a racial diversity standard is to be applied. In any case, it could cause unintended consequences. For example, taxpayers in a 90 percent white neighborhood located in a school district that is 90 percent black and Hispanic could petition to move their neighborhood into a school district that is 60 percent black and Hispanic in order to achieve greater "diversity."

12. Since *Weaverland*, the Secretary has approved petitions for transfer filed under Section 242.1 of the Public School Code of 1949. *See, e.g., In re Establishment of Independent School District Consisting of the Western Portions of Hamlin and Sergeant Townships*, 22 Pa.Cmwlth. 455, 349 A.2d 480 (1975); *In re Establishment of an Independent School District Consisting of Brady Township*, 157 Pa. Cmwlth. 540, 630 A.2d 537 (1993). These cases did not consider the meaning of "merits ... from an educational standpoint," presumably because the Secretary approved the transfers.

In *Weaverland*, a group of taxable inhabitants in East Earl Township petitioned to form an independent school district. At that time, Section 242 of the Public School Code of 1949, which is the predecessor to Section 242.1, permitted the creation of an independent school district as a stand-alone district. Today, the only function of an independent school district is to effect a transfer to another district. The Superintendent of Public Instruction, who was the predecessor to the present Secretary of Education, denied the petition. The Superintendent did so because the creation of a new school district would split the township into two districts and would interfere with an existing, multi-district plan to build a consolidated junior and senior high school.

The petitioners appealed the Superintendent's disapproval, challenging the constitutionality of the standard "merits from an educational standpoint" found in Section 242.[13] The petitioners argued that the standard was vague and impermissibly delegated legislative power to the Superintendent. Our Supreme Court rejected the petitioners' constitutional challenge.

The Supreme Court first analyzed the question of whether Section 242 delegated legislative power to the Superintendent. It began this analysis with the acknowledgement that to be constitutional, a statute must prescribe "with reasonable clarity the limits of the power delegated." *Weaverland*, 378 Pa. at 453, 106 A.2d at 814. It then turned to its prior ruling, *In re:*

*Baldwin Township's Annexation*, 305 Pa. 490, 158 A. 272 (1931), which considered a proviso in the municipal annexation statute that required the State Council of Education to pass on an annexation after reviewing the impact of an annexation on affected school districts. The Court found that the Council's approval power did not offend separation of powers because the Council's power was limited to "school considerations."

In *Weaverland*, the Supreme Court found the *Baldwin Township* rationale equally applicable to Section 242. It explained that:

> The *State Council of Education is a proper arbiter of annexations where "school considerations" are solely involved. And, that is all with which the present case is concerned.* Here, the legislature authorized a procedure for the establishment of independent school districts and ... made the creation of a new district dependent upon the approval thereof by the Superintendent of Public Instruction. *The authority thus conferred is manifestly restricted to "school considerations"....* The power reposed in the Superintendent of Public Instruction by Section 242 ... is obviously less than that which *Baldwin Township* held had been given the State Council of Education by the Act of 1903, as amended.

*Weaverland*, 378 Pa. at 455, 106 A.2d at 814 (emphasis added).

---

13. Section 242 was repealed by the Act of December 7, 1965, P.L. 1034, and replaced with Section 242.1. The language "merits ... from an educational standpoint" appeared in the former Section 242, as it does in the current Section 242.1(a).

Prior to the 1965 amendment, Section 241 placed the trial court in charge of creating independent school districts and instructed the court to consider "the welfare of the pu-pils and taxpayers" of the existing school district and the proposed independent school district. Section 241 applied to all school districts. Section 242 applied only to Fourth Class Districts, *i.e.*, one with less than 5,000 students. The 1965 amendment repealed Section 241 and 242 and replaced them with Section 242.1 which applied to all school districts.

The Supreme Court held that Section 242 did not confer unlimited power upon the Superintendent because "all with which" Section 242 was concerned was "school considerations." Further, the "power reposed" in the Superintendent under Section 242 was "obviously less" than the authority given to the State Council of Education. Stated otherwise, the power conferred upon the Superintendent in Section 242 is a "restricted" power.

The Supreme Court next analyzed the question of whether the standard, "merits from an educational standpoint" was vague. It answered the question in the negative. It explained:

Nor can it reasonably be argued that the standard prescribed by Section 242 of the Code for the guidance of the Superintendent in reaching a conclusion as to the advisability of establishing an independent school district is fatally vague and uncertain. The statute directs the Superintendent to pass upon the merits of the petition "from an educational standpoint." Giving those words their usual and ordinary meaning, Statutory Construction Act of 1937, P.L. 1019, Sec. 33, 46 P.S. § 533, *they can have no other intended import than that the Superintendent must determine whether,* on the basis of his expert knowledge in the field of education, *the establishment of a proposed independent school district will advance or hinder the educational facilities in the designated area. It is difficult to imagine how the legislature could have more explicitly expressed its intention* in the premises.

*Id.* at 455, 106 A.2d at 815 (emphasis added).

In 1954, when *Weaverland* was decided, the Public School Code of 1949 contained a

provision at Section 241 that explains the Supreme Court's above-quoted analysis. Section 241 stated, in relevant part, as follows:

Such petition shall set forth a proper description of the boundaries of the territory to be included in such proposed independent school district, *and the desire of the petitioners for better school facilities than are or would be provided and maintained by the district or districts of which such independent school district is a part.*

24 P.S. § 2–241 (emphasis added). Section 241 has been replaced with the following provision:

Such petitioner shall set forth a proper description of the boundaries of the territory to be included in such proposed independent district, *and the reasons of the petitioners for requesting such transfer* to another school district and the name of the district into which its territory is proposed to be placed.

Section 242.1(a) of the Public School Code of 1949, 24 P.S. § 2–242.1(a). The current law, *i.e.,* Section 242.1(a), does not mention school facilities. Petitioners are now free to cite reasons other than "better school facilities" for their proposed transfer.

*Weaverland* interpreted "merits from an educational standpoint" at a time when approval of an independent school district effected a new district, not a transfer, and the reason for a proposed new district was limited to "better facilities."[14] Nevertheless, *Weaverland* continues to control the construction of "merits from an educational standpoint" in two important respects. First, the Supreme Court held that the Secretary's power under Section 242 is "manifestly restricted," which is necessary

---

**14.** Easton has a population of 9,000 students, and Palisades has a population of 2,000 students. Moving 60 children, ages five to 18, from Easton to Palisades should not impact the "facilities" of either district.

lest the statute violate the proscription against delegating legislative power to an administrative agency. Second, in ruling that "merits from an educational standpoint" was not vague, the Supreme Court turned to other, relevant provisions in the Public School Code of 1949 to give the standard substance. That continues to be the appropriate approach to discerning the meaning and application of the statutory standard.

■ Section 201 of the Public School Code of 1949 established that children in a particular municipality should attend the same schools. It states, in relevant part, as follows:

> All school districts shall remain as now constituted until changed as authorized by this act. Except as otherwise now or hereafter constituted, each city, incorporated town, borough, or township in this Commonwealth, now existing or hereafter created, shall constitute a separate school district, to be designated and known as the "School District of...."

24 P.S. § 2–201. We have construed Section 201 to mean that "in general students in a particular borough should attend the same schools." *Riegelsville I,* 962 A.2d at 26 n. 3. The division of Riegelsville into two different school districts, in two different counties violates this "general rule"

established by the legislature in the Public School Code of 1949.

Further, the only way to place Riegelsville into one district is by the means chosen by the Coalition. Section 242.1(a) requires a proposed independent school district be comprised of "contiguous territory," and the independent district can transfer only to "an adjacent school district *contiguous* thereto." 24 P.S. § 2–242.1 (emphasis added). If the taxable inhabitants of the western half of Riegelsville petitioned to join the eastern half of Riegelsville with a transfer to Easton, their petition would violate Section 242.1(a) because Easton is not "contiguous thereto."

The Coalition's petition is consistent with Section 201 of the Public School Code of 1949. It will place all of Riegelsville into one school district, and it will end Easton's discontiguous borders, with its "island" of one half of Riegelsville, which is not even in the same county as the rest of the Easton School District. The repeated use of "contiguous" in Section 242.1 expresses the legislature's intention that school districts be comprised of contiguous territory.[15] In this respect, the Coalition's petition has merit from an educational standpoint.

The Secretary held that so long as the two districts affected by a proposed trans-

15. Were the Easton School District a legislative district, its configuration would violate the Pennsylvania Constitution. Article II, Section 16 of the Pennsylvania Constitution requires legislative districts to be "compact and contiguous." PA. CONST. art. II, § 16. A contiguous district is

> one in which a person can go from any point within the district to any other point (within the district) without leaving the district, or one in which no part of the district is wholly physically separate from any other part.

*Commonwealth ex rel. Specter v. Levin,* 448 Pa. 1, 17–18, 293 A.2d 15, 23 (1972) (foot-

notes and quotations omitted). Although not constitutionally required, the boundaries of political subdivisions, including counties, cities and boroughs, follow the policy expressed in Article II, Section 16. For example, Section 201 of the Borough Code, Act of February 1, 1966, P.L. (1965) 1656, *as amended,* 53 P.S. § 45201, requires that a borough be comprised of a "contiguous area." The Easton School District's satellite, consisting of half of Riegelsville, located in another county, renders the district neither compact nor contiguous.

fer are in "general parity" there can be no transfer. This greatly restricts the availability of a district transfer because all school districts, save the few that are distressed, are in "general parity" to one another. However, by eliminating the "better school facilities" limit to the creation of an independent school district, the legislature made the remedy more widely available than heretofore. Section 242.1(a) empowered citizens to have a hand in the very important matter of how school district lines are drawn.

In any case, the Coalition offered objective evidence that the two affected school districts are not in parity. That evidence showed that the 60 Riegelsville children presently attending Easton schools will benefit educationally from being transferred to the Palisades School District, a "Blue Ribbon District." Even the Secretary acknowledged that Palisades produced better educational outcomes.[16] The Secretary's own factual findings belie his assertion that the two districts are in "general parity."

The Coalition believes that eliminating the twice daily 10–mile journey along a narrow road in all kinds of weather shows merit from an educational standpoint, and it points to the Riegelsville child who complained, "Why do I go [to Cheston Elementary School in Easton]? I don't know anybody in my class ...." Coalition Brief at 11–12. These kinds of reasons have sufficed in prior decisions of the Secretary

when passing on a proposed transfer. For example, in *In re Establishment of Independent School District Consisting of the Western Portions of Hamlin and Sergeant Townships,* 22 Pa.Cmwlth. 455, 349 A.2d 480 (1975), the Secretary approved a transfer as having merit from an educational standpoint where the petitioners sought to reduce the distance of travel for the affected students.[17] In *In re Establishment of an Independent School District Consisting of Brady Township,* 157 Pa.Cmwlth. 540, 630 A.2d 537, 538 (1993), the Secretary approved a transfer where the petitioners sought a better curriculum, closer schools, a new facility and better school district management. The Secretary's disapproval of the Coalition's petition cannot be reconciled with prior approvals of similar transfer requests.

Tax considerations are another of the stated reasons for the Coalition's petition.[18] The Coalition contends that its members' school taxes rose 30 percent in 2006, whereas the other taxpayers in Easton saw an increase of 4.5 percent. If all of Riegelsville is placed into Palisades, according to the Coalition, the taxable inhabitants presently assigned to Easton will have their school taxes reduced by 50 percent. As noted, reasons to support a petition are no longer limited to "better school facilities," and, thus, there is no problem with tax concerns expressed by the Coalition. There must be educational merit as well.

16. There may be some children, particularly those in high school, that may not wish to change. These are issues of implementation.

17. In spite of the Secretary's approval, the trial court denied the petition as not sufficiently detailed on educational programs. This Court reversed, holding that the trial court lacked authority to pass on the educational merits of the proposed transfer of the independent school district.

18. Certainly, there are tax challenges in the current assignment of Riegelsville to Easton. Specifically, the Easton School District's taxing authority must deal with two counties, each with different boards of assessment, different assessment methodologies, different pre-determined ratios and different millage rates. These challenges underscore the need for contiguous school district boundaries and to have districts located, where possible, in one county.

In sum, we hold as follows with respect to the scope and meaning of the Secretary's statutory authority to "pass" on the "merits from an educational standpoint" of proper school district transfer. First, the Secretary's authority is not open-ended but restricted to the substantive provisions in the Public School Code of 1949.[19] Second, the Coalition's petition, on its face, appears to have educational merit because it will end the discontiguous boundaries of Easton, which offend both Section 201 and 242.1 of the Public School Code of 1949. Third, the proposed independent school district will place all of Riegelsville into one school district, which accords with Section 201. Fourth, the affected children will be placed in a school district that produces better academic results and eliminate a long commute, assuming the Coalition's evidence is credited upon remand. If the Secretary believes that there are other provisions in the Public School Code of 1949 that will not be served by the Coalition's petition, they must be identified. In any case, when the Secretary exercises his discretion to determine whether a proposed transfer has "merit from an educational standpoint," he must be guided by the policy choices made by the legislature in the Public School Code of 1949 and not by his own personal sense of what constitutes good education policy.

### Conclusion.

The Secretary should have held a formal administrative hearing and then issued a new adjudication based on the evidence submitted to the Department's hearing examiner by the parties. Because the Secretary did not do so, we vacate his second adjudication and the trial court's order denying the Coalition's petition and remand the matter for a proper adjudication. We are mindful that the Coalition's petition is four years old. Further, the parties have already presented extensive evidence at the hearing before the trial court. In the interest of judicial economy, it is appropriate that the parties stipulate to make the trial court's record the record before the Secretary on remand. The parties may, if necessary and appropriate, augment that stipulated record and make any relevant arguments on the merits of the petition. In adjudicating the Coalition's petition, the Secretary must consider the appropriate meaning of the term "merits from an educational standpoint" as set forth in this opinion.

### ORDER

AND NOW, this 13th day of April, 2011, the order of the Court of Common Pleas of Bucks County in the above-captioned case, dated October 30, 2009, is hereby VACATED and the matter is REMANDED to the trial court with instructions to remand to the Secretary of Education for further proceedings in accordance with the foregoing opinion.

Jurisdiction relinquished.

DISSENTING OPINION BY Senior Judge FRIEDMAN.

I respectfully dissent. The majority vacates the order of the Court of Common

---

19. The dissent is mistaken in its suggestion that the Secretary will be precluded from considering the Adequate Yearly Progress (AYP) criteria established under the federal No Child Left Behind Act of 2001, 20 U.S.C. § 6311(b)(2). These standards were not established by the federal government but, rather, were created by Pennsylvania as allowed by the No Child Left Behind Act. The AYP criteria relate back to the Public School Code, which authorizes the adoption of AYP criteria for Pennsylvania and authorizes the state to accept federal grants. 24 P.S. § 26–2603–B, added by the Act of March 30, 1988, P.L. 321. Furthermore, the Pennsylvania AYP criteria are a matter of the Department's own regulation at 22 Pa.Code § 403.3.

Pleas of Bucks County (trial court) and remands this case to the trial court with instructions to remand the case to the Secretary of Education (Secretary) for a formal administrative hearing on the educational merits of the proposed school district transfer, but, "[i]n the interest of judicial economy," the majority would have the parties stipulate that the existing trial court record be "the record before the Secretary" and, only "if necessary and appropriate, augment that stipulated record." (Majority Op. at 991.) For the following reasons, I cannot accept this disposition.

First, such a result exceeds the scope of this court's prior remand order in *In Re: Petition for Formation of Independent School District*, 962 A.2d 24 (Pa.Cmwlth. 2008) (*Riegelsville I*). Second, the Riegelsville Tax and Education Coalition (Coalition) did not raise the failure of the Secretary to hold a hearing as an issue in *Riegelsville I* or in this appeal. Third, the majority's order does not serve the interest of judicial economy because the Secretary already has issued an adjudication

based on the trial court's record and because the parties have been given a third opportunity to present evidence in support of their positions. Fourth, the majority does not give proper deference to the Secretary's expertise in the field of education.

To provide some background, the Coalition filed a petition for the formation of an independent school district with the trial court pursuant to section 242.1(a) of the Public School Code of 1949 (Code)[1] seeking to transfer all school-related services from the Easton Area School District to the Palisades School District. The trial court referred the matter to the Secretary, who requested that the affected school districts provide information that would enable the Secretary to make an informed decision. On January 24, 2008, the Secretary determined that the proposed transfer lacked merit from an educational standpoint. As a result of the Secretary's determination, and pursuant to section 242.1(a) of the Code, the trial court denied the petition.[2]

The Coalition filed a notice of appeal with this court, arguing that the trial court

1. Act of March 10, 1949, P.L. 30, added by the Act of June 23, 1965, P.L. 139, *as amended*, 24 P.S. § 2–242.1(a). Section 242.1(a) of the Code provides, in pertinent part, as follows:

> A majority of the taxable inhabitants of any contiguous territory in any school district or school districts ... may present their petition to the **court of common pleas** ... asking that the territory be established as an independent district for the sole purpose of transfer to an adjacent school district contiguous thereto.... Such petitions shall set forth ... the reasons of the petitioners for requesting such transfer to another school district and the name of the district into which its territory is proposed to be placed.
>
> The court shall hold hearing thereon.... In all cases where an independent district is proposed for transfer from one school district to another, **the merits of the petition for its creation, from an educational stand-**

> **point, shall be passed upon by the [Secretary] and the petition shall not be granted by the court unless approved by him.** The court of common pleas shall secure the reaction from the [Secretary] upon receipt of the petition properly filed.
>
> 24 P.S. § 2–242.1(a) (emphasis added).

2. In *In Re Establishment of Independent School District Consisting of the Borough of Wheatland*, 846 A.2d 771, 773 n. 2 (Pa. Cmwlth.2004), this court noted:

> Under Section 242.1 of the Public School Code, the trial court has the limited role of determining whether there has been procedural compliance with the statutory provisions; it has no authority to inquire into or determine the merits of the petition requesting the transfer, and it does not inquire into the reasons assigned by the petitioners. That role is exclusively within the province of the designated educational authorities.

erred in denying its petition because the Secretary violated section 507 of the Administrative Agency Law (Law)[3] by failing to issue an adjudication containing findings and the reasons for the adjudication. This court agreed, issuing an order that vacated the trial court's order and remanded the case to the trial court "in order that the trial court may secure a proper adjudication from the Secretary of Education." *Riegelsville I*, 962 A.2d at 29.

## I. Scope of Remand Order

On remand, the trial court held a hearing for the purpose of creating a record for submission to the Secretary. Based on that record, at least in part, the Secretary issued an adjudication concluding that the Coalition's petition lacked merit from an educational standpoint. However, this court's remand order did **not** direct the trial court to hold a hearing to create a record for the Secretary's consideration in issuing the adjudication. This court required only that the Secretary cure the defects in its initial determination by preparing a proper adjudication under section 507 of the Law, i.e., with findings and reasons, based on the record that the Secretary **originally possessed.**

In my view, the trial court exceeded the scope of this court's remand order by creating a new record for the Secretary, and the Secretary exceeded the scope of this court's remand order by considering that record. Unlike the majority, I would vacate and remand for an adjudication by the Secretary based on the record that the Secretary **originally possessed.**

## II. Waiver

In *Riegelsville I*, the Coalition did not argue that it was denied a proper hearing prior to the Secretary's issuance of an adjudication. The Coalition argued only that the Secretary's adjudication did not satisfy the requirements of section 507 of the Law because it lacked findings and the reasons for the adjudication. Thus, any contention here that the Secretary failed to hold a proper hearing has been waived.

Indeed, the majority sets forth the only three issues preserved for consideration by this court in this appeal: whether the Secretary used the wrong standard for evaluating the educational merits of the proposed transfer; whether the Secretary capriciously disregarded uncontradicted evidence; and whether the Secretary exceeded the scope of his statutory authority. (Majority Op. at 980–81.) No party argues that the Secretary denied it a proper hearing, and it is improper for this court to raise the issue *sua sponte.*

## III. Judicial Economy

The Secretary already has considered the trial court's record in making the adjudication presently before us. Nevertheless, the majority is directing that the Secretary revisit that record. It is conceivable that, on remand, the Secretary would simply accept the trial court's record as its own and re-issue the same adjudication. This is not judicial economy.

Moreover, the parties built the initial record before the Secretary on factors that they believed were relevant to a determination of the educational merit of the proposed transfer. At the unauthorized hearing before the trial court, the parties attempted to bolster their cases with evidence on additional factors that they believed pertained to the educational merit of the proposed transfer. The majority's position is to allow the parties a third opportunity, "if necessary and appropriate,"

---

**3.** 2 Pa.C.S. § 507. Section 507 of the Law states, "All adjudications of a Commonwealth agency ... shall contain findings and the reasons for the adjudication...." *Id.*

to present evidence on the relevant factors for determining educational merit. It is not clear to me why it would be "necessary" or "appropriate" for any party to present additional evidence.

## IV. Deference

In *In re Weaverland Independent School District*, 378 Pa. 449, 455, 106 A.2d 812, 815 (1954) (emphasis added), our supreme court gave the words "from an educational standpoint" their "usual and ordinary meaning" and concluded that, in determining whether a proposed transfer has merit from an educational standpoint, the Secretary "must determine whether, **on the basis of his expert knowledge in the field of education,** the establishment of a proposed independent school district will advance or hinder the educational facilities in the designated area."

When an administrative agency has made a decision pursuant to its duty under the law, this court, in reviewing the decision, must extend great deference to the administrative agency's expertise in interpreting the legislative requirement. *City of Philadelphia v. Pennsylvania Labor Relations Board*, 982 A.2d 136, 138–39 (Pa. Cmwlth.2009). This court will defer to the agency's expertise to the extent that its conclusions are reasonable and not arbitrary or capricious. *Id.* at 139. Thus, here, because of the Secretary's expert knowledge in the field of education, we must defer to his interpretation of what constitutes educational merit, as long as the interpretation is reasonable and not arbitrary or capricious.

Instead of this court advising the Secretary regarding the factors he may or may not consider, as the majority has done,[4] I would direct that, on remand, to the degree that the record originally possessed by the Secretary contains evidence regarding student diversity, student performance, geographic fit and busing matters, the Secretary shall discuss whether, based on his expert knowledge in the field of education, these are appropriate considerations in determining whether the proposed independent school district will advance or hinder the educational facilities in the designated area. Should the parties bring the matter before this court again, we would then decide whether the Secretary reasonably supported his consideration of any such factors.

## V. Educational Merit

Having indicated that I would permit the Secretary to determine, in the first instance, whether the proposed transfer has educational merit, I must express my disagreement with some of the majority's conclusions regarding educational merit.[5]

The majority concludes that, in determining the merit of a proposed transfer "from an educational standpoint," the Secretary is "restricted to the substantive provisions" of the Code. (Majority Op. at 991.) However, the Code does not define the words "merit . . . from an educational standpoint."

Moreover, under *Weaverland*, 378 Pa. at 455, 106 A.2d at 815, we must give those words their "usual and ordinary meaning."

---

4. In my view, the majority has substituted its own brand of educational merit for that of the Secretary.

5. It is clear that, whatever "merits . . . from an educational standpoint" means, the Secretary must make his determination regarding the proposed transfer based on the best interests of the children. *See, generally, Walker v.*

*School District of the City of Scranton*, 338 Pa. 104, 12 A.2d 46 (1940) (stating that the fundamental public policy expressed in the Pennsylvania Constitution is to obtain a better education for the children of the Commonwealth, and, therefore, school officials must act in the best interests of the children).

Thus, as our supreme court indicated, "merit ... from an educational standpoint" means merit based on the knowledge of experts in the field of education. *Id.* As we have previously stated, "[w]e are not educators nor is it our place to substitute our judgment for those of learned educators who have experience and knowledge in such matters." *Reading School District v. Department of Education,* 855 A.2d 166, 173 (Pa.Cmwlth.2004).

Furthermore, in restricting the Secretary's discretion to the substantive provisions of the Code, **the majority does not explain how the Secretary is to use the Code provisions as a guide.** For example, the majority suggests that the Secretary has improperly considered racial diversity. However, the Code contains provisions pertaining to race, including section 1310(a) of the Code, 24 P.S. § 13–1310(a), which prohibits distinctions based on race in the assignment of pupils to schools within a district. On remand, the Secretary could reasonably interpret section 1310(a) of the Code as encouraging racial diversity in the public schools and as justifying its consideration.

In addition, section 291 of the Code, added by section 3 of the Act of August 8, 1963, P.L. 564, 24 P.S. § 2–291, requires that the State Board of Education consider the following factors, *inter alia,* in **organizing** the public schools: topography, community characteristics and transportation of pupils. Although the majority states that the petition in this case has educational merit because it would eliminate a long commute for pupils, (Majority Op. at 991), the Secretary could reasonably interpret section 291 of the Code as being inapplicable here because it provides factors for consideration by the State Board from an **organizational,** not an educational, standpoint.

Finally, I note that the Secretary based his determination, in part, on the Adequate Yearly Progress (AYP) criteria established in the federal No Child Left Behind Act of 2001, 20 U.S.C. § 6311(b)(2). The majority's holding precludes the Secretary from considering the federal criteria on remand. However, in my view, inasmuch as the Secretary is subject to federal law as well as state law, the Secretary would not abuse his discretion by applying the AYP criteria to his determination of the educational merit of the proposed transfer.