# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Washington Township Independent : 
School District, : 
                  Petitioner : 
                   : 
           v. :   No. 142 C.D. 2019
                   :   Argued:  December 12, 2019
Pennsylvania State Board of Education, : 
                  Respondent : 


**BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge**
**HONORABLE P. KEVIN BROBSON, Judge**
**HONORABLE ANNE E. COVEY, Judge**

**OPINION BY JUDGE BROBSON**        **FILED:  June 4, 2020**

## I.   INTRODUCTION

Following our remand order in *Washington Township Independent School District v. Pennsylvania State Board of Education*, 153 A.3d 1177 (Pa. Cmwlth. 2017) (*WTISD I*) (en banc), the Pennsylvania State Board of Education (Board) disapproved the application of Washington Township Independent School District (WTISD) for assignment from Dover Area School District (Dover SD) to adjacent Northern York County School District (Northern York SD).[1]  WTISD petitions for review of the Board's adjudication.  For the reasons set forth below, we will reverse and remand.

---

[1] In *WTISD I*, this Court vacated the Board's November 19, 2015 Order, which, like the current decision on appeal, disapproved the creation of WTISD and its transfer from Dover SD to Northern York SD.  We remanded with instructions that the Board follow certain administrative procedures and confine its review of the application to the standards applicable to the organization of school districts within the Commonwealth.

## II.  BACKGROUND

Washington Township is located in the northwest corner of York County, along York County's western border with Adams County.  In York County, Washington Township borders Franklin Township to the northwest, Carroll Township to the north, Warrington Township to the northeast, Dover Township to the southeast, and Paradise Township to the south.  Franklin, Carroll, and Warrington Townships lie in Northern York SD, along with Monaghan Township. Dover SD includes only Washington and Dover Townships.



The Public School Code of 1949 (School Code)[2] provides a mechanism by which a majority of taxpayers within a municipality may petition the court of common pleas to establish the municipality as an independent school district for the

_____

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 to 27-2702.

2

sole purpose of transferring the municipality from its current school district to an adjacent contiguous school district. The three-step process involves the court of common pleas, the Secretary of Education (Secretary), and the Board. In July 2012, the Washington Township Education Coalition (WTEC) filed a petition with the Court of Common Pleas of York County (common pleas court), requesting a transfer of Washington Township from Dover SD to Northern York SD and enumerating its reasons for asserting that the transfer had educational merit. After conducting a hearing and confirming that 1,406 of Washington Township's 1,929 taxable inhabitants (approximately 73%) had signed the petition, that the petition properly described the territory, and that the petition set forth WTEC's reasons for the requested transfer, the common pleas court referred the petition to the Secretary for her educational merits review.[3]

In evaluating the merits of the petition from an educational standpoint, the Secretary[4] considered the potential impact of the transfer on the Washington

---

[3] The initial procedure before a court of common pleas is outlined in Section 242.1(a) of the School Code, added by the Act of June 23, 1965, P.L. 139, 24 P.S. § 2-242.1(a). As we explained in *WTISD I*:

> In ruling on a petition, the court's role is strictly procedural, and it is not to inquire into petitioner's alleged reasons for the proposed transfer or rule on the merits of those reasons. . . .

> [B]efore approving the petition, the common pleas court must refer the petition to the Secretary for a determination of "the merits of the petition . . . from an educational standpoint." Section 242.1(a) of the School Code. . . . If the Secretary determines that the petition has merit, and the common pleas court determines that the petition meets the technical requirements above, the common pleas court must order the establishment of an independent school district.

*WTISD I*, 153 A.3d at 1179-80.

[4] In July 2014, the Acting Secretary of Education was Dr. Carolyn Dumaresq. (Certified Record (C.R.) Item No. 3.) Secretary Dumaresq delegated the matter to the Acting Deputy

Township students, the students who would remain in Dover SD, and the students in Northern York SD. After comparing the respective schools' performances on certain educational metrics (SAT scores, proficiency in math and reading, graduation rates, drop-out rates, truancy rates, and in-school arrest rates), the Secretary concluded that Northern York SD outperformed Dover SD on each of the metrics. Ultimately determining that the proposed transfer would have a positive educational impact on the Washington Township students and that the parties had not presented sufficient evidence to demonstrate that the transfer would have a negative impact on the students who would remain in Dover SD or the students in Northern York SD, the Secretary deemed the petition meritorious from an educational standpoint.

The common pleas court thereafter entered an order, dated November 10, 2014, creating WTISD and transmitting the matter to the Board for review pursuant to Sections 292.1 and 293.1 of the School Code, 24 P.S. §§ 2-292.1, 2-293.1.[5] A committee of the Board held a multi-day hearing in June 2015.

---

Secretary for the Office of Elementary and Secondary Education to prepare a pre-adjudication determination. The Deputy Secretary issued her determination on July 2, 2014. By letter dated August 7, 2014, Secretary Dumaresq notified the common pleas court that no party appealed the pre-adjudication determination, as provided in Section 35.20 of the General Rules of Administrative Practice and Procedure, 1 Pa. Code § 35.20 ("Actions taken by a subordinate officer under authority delegated by the agency head may be appealed to the agency head by filing a petition within 10 days after service of notice of the action."). Accordingly, Secretary Dumaresq informed the common pleas court that the pre-adjudication determination became the final adjudication in the matter, and she relinquished jurisdiction to the common pleas court.

[5] Following approval of the petition by the common pleas court and the Secretary, the matter moves to the Board under Section 292.1 of the School Code, which provides:

> When an independent district is created by the court of common pleas for purposes of transfer from one school district to another, the court shall submit to the State Board of Education its decree creating such district. *Such decree shall be considered an application for the*

4

Ultimately, the committee recommended that the Board disapprove the petition for the creation of WTISD and its transfer from Dover SD to Northern York SD. Following an affirmative vote of the majority of its members, the Board adopted and accepted the committee's recommendation and disapproved WTISD's petition.

WTISD petitioned this Court for review, raising a multitude of issues, including whether the Board improperly disregarded and/or deviated from the Secretary's determination of educational merit, erred in not considering the petition pursuant to that standard, and erred in not deeming relevant the same measures of comparison that the Secretary accorded weight. In considering this issue, we examined the respective roles of the Secretary[6] and the Board in the context of

---

> *assignment of said district to the designated administrative unit of the approved county plan.*

(Emphasis added.)

[6] The Secretary's role is set forth in Section 242.1(a) of the School Code, which provides, in pertinent part:

> In all cases where an independent district is proposed for transfer from one school district to another, the merits of the petition for its creation, from an educational standpoint, shall be passed upon by the [Secretary] and the petition shall not be granted by the court unless approved by him.

We observed that the Secretary's "authority is not open-ended but instead restricted to the substantive provisions of the School Code." *WTISD I*, 153 A.3d at 1184 (citing *In re Petition for Formation of Indep. Sch. Dist.*, 17 A.3d 977, 991 (Pa. Cmwlth. 2011) (*Riegelsville II*)). Further, analogizing the Secretary's role to a veto power, we held in *Riegelsville II*:

> [W]hen the Secretary exercises his [or her] discretion to determine whether a proposed transfer has "merit from an educational standpoint," he [or she] must be guided by the policy choices made by the legislature in the [School Code] and not by his [or her] own personal sense of what constitutes good education policy.

5

independent school districts for transfer purposes, beginning with Article II, Subarticle (i) of the School Code,[7] which is commonly referred to as the School Reorganization Act of 1963. As to the Board's role, we wrote:

> To accomplish the purposes and goals of the School Reorganization Act of 1963, the General Assembly granted the Board certain powers and duties. First, the General Assembly mandated that the Board, by no later than July 1, 1965, develop statewide standards and procedures to evaluate objectively the performance (*i.e.*, adequacy and efficiency) of the educational programs of each public school in the Commonwealth. Section 290.1 of the School Code.[8] *Second, the General Assembly mandated that the Board, within 90 days of the effective date of the act, develop standards for approval of administrative units, which, once approved, would become school districts.* Sections 291,[9] 296,[10] 297[11] of

---

*Riegelsville II*, 17 A.3d at 991. "This 'manifest restriction' on the Secretary's power is 'necessary lest the statute violate the proscription against delegating legislative power to an administrative agency.'" *WTISD I*, 153 A.3d at 1184 (quoting *Riegelsville II*, 17 A.3d at 991).

[7] Added by the Act of August 8, 1963, P.L. 564, 24 P.S. §§ 2-290 to -298. "The General Assembly enacted the School Reorganization Act of 1963 because it recognized that the existing system of more than 2,000 school districts in the Commonwealth was 'incapable of providing adequate education and appropriate training for all of the children of the Commonwealth.'" *WTISD I*, 153 A.3d at 1185 (quoting Section 290 of the School Code, 24 P.S. § 2-290). "[T]he primary legislative objective" of the School Reorganization Act of 1963 was "reorganization in the direction of fewer and larger units." *Chartiers Valley Joint Schs. v. Cty. Bd. of Sch. Dirs. of Allegheny Cty.*, 211 A.2d 487, 494 (Pa. 1965) (discussing purpose of School Reorganization Act of 1963 and upholding its constitutionality). The General Assembly added Sections 242.1, 292.1, and 293.1 to the School Code through the Act of June 23, 1965, P.L. 139, "in order to provide additional authority to the Board with respect to the reorganization of school districts." *WTISD I*, 153 A.3d at 1186. "During this time, the Board was in the process of performing its statutory duties under the School Reorganization Act of 1963 . . . ." *Id.* at 1184-85.

[8] 24 P.S. § 2-290.1.

[9] 24 P.S. § 2-291.

[10] 24 P.S. § 2-296.

[11] 24 P.S. § 2-297.

6

> the School Code. *In establishing these standards, the General Assembly required the Board to consider "topography, pupil population, community characteristics, transportation of pupils, use of existing school buildings, existing administrative units, potential population changes and the capability of providing a comprehensive program of education."* Section 291 of the School Code.

*WTISD I*, 153 A.3d at 1185-86 (emphasis and footnotes added) (footnote omitted).

As to the Board's role, specifically as it relates to the General Assembly's enactment of Sections 292.1 and 293.1 of the School Code, we observed:

> *These amendments to the School Code empower the Board to either "approve or disapprove the creation and transfer" of an independent school district.* Section 293.1 of the School Code. *Neither Section 292.1 nor 293.1 of the School Code set forth standards or factors that the Board should consider in this step of the approval process.* As we recognized in *Riegelsville II* with respect to the Secretary's authority, however, the Board's authority is not open-ended, but instead restricted to the substantive provisions of the School Code, as supplemented by Act 150.[12]

*WTISD I*, 153 A.3d at 1186 (emphasis and footnote added) (citation omitted).

Having examined the statutory provisions, we described the Board's review as follows:

> [W]e conclude that the Board's authority under Section 293.1 of the School Code derives from and relates to the Board's authority to set standards for the approval of the organization of school districts in the

---

[12] In 1968, the General Assembly passed the School District Reorganization Act of 1968, Act of July 8, 1968, P.L. 299, 24 P.S. §§ 2400.1-.10, also referred to as Act 150. The General Assembly passed Act 150, a supplement to the School Reorganization Act of 1963, to facilitate completion of the orderly reorganization of school districts required under the School Reorganization Act of 1963. *See Appeal of Borough of Cambridge Springs Sch. Dist.*, 275 A.2d 840 (Pa. Super. 1971) (en banc).

Commonwealth under Section 292 of the School Code.[13] The entirety of the "reorganization" subdivision of the School Code, as supplemented by Act 150, is devoted to providing procedures and standards for the creation of school districts. Today, we presume that Pennsylvania's existing 500 school districts are subject to these standards.

When it receives the trial court's decision creating an independent school district for transfer purposes, the Board is required to treat that decision as an application for the assignment of that independent school district to an existing school district. Section 292.1 of the School Code. In other words, the application is a request to the Board to redraw school district lines—*i.e.*, to amend an existing plan of organization. *In evaluating that request, the Board is constrained to apply the standards for the creation and organization of school districts, those being the standards that the General Assembly directed the Board to develop in Section 291 of the School Code and Section 1 of Act 150.* Both sections provide:

> The State Board of Education . . . shall adopt standards for approval of administrative units . . . taking into [account/consideration] the following factors: topography, pupil population, community characteristics, transportation of pupils, use of existing school buildings, existing administrative units, potential population changes and the capability of providing a comprehensive program of education.

Section 1 of Act 150; Section 291 of the School Code. *The Board must also consider the following directive of the General Assembly, also found in both [Section 293(a) of] the School Code*[14] *and [Section 3 of] Act 150*:

> [N]o plan of organization of administrative units shall be approved in which any proposed school district contains a pupil

---

[13] 24 P.S. § 2-292.

[14] 24 P.S. § 2-293(a).

population of less than four thousand (4,000), unless when factors of topography, pupil population, community characteristics, transportation of pupils, use of existing school buildings, existing administrative units, potential population changes and the capability of providing a comprehensive program of education are considered by the [Board] as requiring the approval of a plan of organization of administrative units in which one or more of the proposed school districts contains a pupil population of less than four thousand (4,000).

Section 3 of Act 150; Section 293(a) of the School Code.

The Board's scope of review under Section 293.1 of the School Code must be distinguished from the Secretary's "educational merits" review under Section 242.1 of the School Code. Under the latter, the Secretary is to evaluate only the educational merit *of the petition* to create an independent school district for transfer purposes. Under Section 293.1 of the School Code, and based on the standards set forth above, the Board is reviewing not the petition filed and approved by the Secretary and the common pleas court, but an application for assignment of the newly-created independent school district to the designated receiving school district, as set forth in the common pleas court's decree. It must look at the proposed amendment to the organizational plan and determine whether the assignment of the newly-created independent school district to the receiving district would violate the adopted Board standards or express statutory standards that govern the organization of school districts. *If allowing the assignment would not violate these standards, then the Board should approve the amendment "and direct the Council . . . to make the necessary changes [to] the county plan." Section 293.1 of the School Code. If approval of the application would be contrary to these standards, then the Board should deny the application.*

In short, the Board's review is the third and final review in a three-part process to seek approval for the creation and transfer of an independent school district to another

9

existing school district. . . . The common pleas court reviews the petition for completeness. The Secretary reviews the petition for educational merit. The Board reviews the common pleas court's decree as an application in order to determine whether assignment of the newly-created independent school district to the receiving district would violate standards for the organization of school districts adopted by the Board and established by statute.

*WTISD I*, 153 A.3d at 1186-88 (emphasis added and in original) (footnote omitted).

As to the Board's initial decision disapproving the creation and transfer of WTISD, we concluded:

Turning to the Board's decision on appeal, it is clear from reading both the initial written decision (September 17, 2015) and the written decision on reconsideration (November 19, 2015) that the Board was operating under the false impression that its review in this matter was broad and virtually unlimited. The Board cites to no standards governing its review in either written decision. *The Board's scope and standard of review should have been confined to determining whether assignment of WTISD to Northern York [SD] would result in a reorganization of school districts that violated statutory and Board-promulgated standards.* Because the Board did not so confine its review, we must vacate the Board's decision and remand the matter to the Board for review and reconsideration under the proper scope and standard of review.

*Id.* at 1188 (emphasis added) (footnote omitted). In doing so, "[w]e acknowledge[d] that there could be some overlap between the Secretary's educational merits review . . . and the Board's review . . . , considering the Board's mandate to consider 'the capability of providing a comprehensive program of education' in setting its standards for the organization of school districts. Section 291 of the School Code." *Id.* at 1188 n.19.

10

We vacated the Board's order and remanded the matter to the Board with direction

> to treat the common pleas court's November 10, 2014 "Order Establishing Independent School District for Purposes of Transfer Pursuant to 24 P.S. [§] 2-242.1" as an application for the assignment of WTISD to Northern York [SD]. Section 292.1 of the School Code. The Board shall place this item on the agenda for its next meeting, at which the Board must either vote to approve or disapprove the application. Section 293.1 of the School Code. As noted above, in rendering this preliminary decision, the Board must adhere to the proper scope and standard of review. If approved, the Board must direct the Council to make appropriate revisions to the school district lines. *Id.* If disapproved, the Board must give its reasons for the disapproval. *Id.* Thereafter, if requested by WTISD, the Board must hold a hearing confined to its reasons for disapproval and thereafter issue an adjudication that comports with the [Administrative Agency Law, 2 Pa. C.S. §§ 501-508, 701-704].

*Id.* at 1189.

On remand, the Board convened on March 9, 2017, to reconsider the application for assignment, and the Board denied the application. By letter dated May 11, 2017, the Board memorialized the reasons for its preliminary determination. First, the Board expressed concern that the application, if granted, would impair the ability of Dover SD and Northern York SD to provide a comprehensive program of education for their students. Second, the Board felt that it was unlikely that Northern York SD's existing facilities could accommodate the students from WTISD. Third, the Board expressed concerns about the difference in curricula between the two school districts, noting that each school district has established a curriculum tailored to their particular students' aptitudes, abilities, and interests. Finally, the Board

11

noted that consideration of communities of interest did not weigh in favor of approving the transfer.

WTISD requested a hearing. By letter dated May 19, 2017, the Board appointed a hearing officer and instructed the hearing officer to prepare a proposed report and order for the Board's consideration.[15] By letter dated August 2, 2017, the hearing officer sought clarification from the Board regarding various aspects of the matter. By letter dated September 14, 2017, the Board provided the hearing officer and parties with instructions regarding the issues to be addressed, the school districts to be considered, and the burden of proof. In that letter, the Board instructed the hearing officer to address the factors set forth in Section 291 of the School Code and in *Hoots v. Commonwealth of Pennsylvania*, 672 F.2d 1107 (3d Cir. 1982). In April 2018, the hearing officer conducted an administrative hearing over the course of several days.[16]

---

[15] *See* 1 Pa. Code §§ 35.202, .205.

[16] At the hearing, WTISD called Robert Schoch, an education finance consultant, as a witness. It also elicited the testimony of several residents of Washington Township: (1) Joe Sieber; (2) Kathy Kennedy Meyer; (3) Ralph McGregor; and (4) John Peters. Intervenor Dover Area Education Association, PSEA/NEA (DAEA) called Carla Claycomb, Ph.D., an employee of the Pennsylvania State Education Association (PSEA) in various capacities since 2003, as a witness. Dover SD offered the testimony of several of its employees: (1) Tracy L. Kum, Superintendent; (2) Jennifer A. Benko, Business Manager; (3) Jared C. Wastler, Dover Area High School Principal; (4) Christopher E. Cobb, North Salem Elementary School Principal; and (5) Charles Benton, Director of Career Education and Academic Services and Dover Area High School Director of Career and Technical Education Programs. Keep Us in Dover Schools (KIDS), organized to oppose the transfer of Washington Township to Northern York SD, called the following witnesses: (1) Rachel Mailey, a parent of students who currently attend Dover SD schools and a resident of Washington Township; (2) Sandra Sweitzer, a farmer who currently resides within the boundaries of Dover SD, presumably in Washington Township; and (3) Heather Dengler, a resident of Washington Township with students who attend schools in Dover SD. Northern York SD called as a witness its Superintendent, Eric C. Eshbach, Ed.D.

12

Following the close of the record, the hearing officer issued a proposed report (Proposed Report), in which he described the standards he applied as follows:

> The standards identified by the Board for consideration are as follows: 1) Whether the transfer makes available educational programs and educational opportunities to meet the varying needs, aptitudes, abilities and interests of individuals residing in the district; 2) Whether the geographic area (as defined by the re-structured district) has developed the characteristics of a community; 3) Whether the transfer utilizes existing buildings to the maximum extent practical avoiding unnecessary new construction where possible; 4) Whether pupil population changes are supported by reliable studies of area development and demonstrate the desirability of the transfer; and 5) Whether the transfer demonstrates a capability of providing a comprehensive program of education. Importantly, the factors set forth by the [] School Code at 24 P.S. § 2-291, and those articulated by the Board are not mutually exclusive. Instead, the two frameworks clearly have overlapping aspects and, therefore, must be considered in conjunction with one another, where possible. This [P]roposed [R]eport is being rendered in accordance with the directives concerning the factors to be considered, as set forth in the Board's September 14, 2017 correspondence.

(Decision at 41-42.)

The hearing officer included in the Proposed Report findings of fact, summarizing the testimony of the witnesses, and the following conclusions of law:

> 1. The Board is not precluded from approving the transfer of [WTISD] into [Northern York SD] by 24 P.S. § 2-293(a) based upon the student population of each school district.
>
> 2. The evidentiary record establishes by a preponderance of the evidence that the [Dover SD] and [Northern York SD] will be able to provide comprehensive programs of education to their students following the transfer of [WTISD] to [Northern York SD].

13

3.    The evidentiary record establishes by a preponderance of the evidence that the transportation of [WTISD] students will be enhanced by the transfer of [WTISD] into [Northern York SD].

4.    *The evidentiary record does not establish by a preponderance of the evidence that the transfer of [WTISD] to [Northern York SD] will make educational programs and opportunities available which meet the varying needs, aptitudes, abilities and interests of individuals residing in both school districts.*

5.    *The evidentiary record does not establish by a preponderance of the evidence that the geographic area will reflect the characteristics of the community as a result of the transfer of [WTISD] to [Northern York SD].*

6.    *The preponderance of the evidentiary record does not weigh in favor of transferring [WTISD] to [Northern York SD] based upon the use of existing buildings to [the] maximum extent practical, and the avoidance of unnecessary new construction.*

7.    *The preponderance of the evidentiary record does not weigh in favor of transferring [WTISD] to [Northern York SD] based upon pupil population changes.*

8.    Approval of the transfer of [WTISD] to [Northern York SD] would be contrary to the standards adopted by the Board.  24 P.S. § 2-291; *Hoots v. Commonwealth of Pennsylvania*, 672 F.2d 1107, 1111 n.3 (3[]d Cir. 1982).

(Decision at 39-40 (emphasis added).)

Thus, the Proposed Report concluded that the proposed transfer of WTISD met the standards pertaining to comprehensive programs of education and transportation but failed to meet standards pertaining to varying needs, aptitudes, abilities and interests of individuals residing in both school districts; characteristics of a community; lack of pupil populations studies; and use of existing buildings to the maximum extent practical and the avoidance of unnecessary new construction. Following the filing of exceptions, by order dated January 10, 2019, the Board

14

adopted the Proposed Report and, upon a vote by a majority of the members of the Board, denied WTISD's application. This appeal followed.

## III. ISSUES

On appeal, WTISD argues that the Board disregarded this Court's remand order, directing the Board to apply the statutory and board standards for organization of school districts when it appointed a hearing officer and directed that hearing officer to apply different standards. WTISD also argues that, in denying the application, the Board improperly engaged in a "weighing test" to determine whether the transfer would be *beneficial* or *desirable*, rather than determining simply whether the transfer met the statutory or adopted Board standards. Finally, WTISD argues that the hearing officer failed to evaluate the evidence properly, because his findings merely summarized testimony and did not review the documents admitted as evidence.

In addition to the merits, pending before the Court is the Board's Application for Leave to File Post-Submission Communication Pursuant to Pa. R.A.P. 2501(a) ("Board Application").[17]

## IV. DISCUSSION

### A. Board Application

Our remand order directed the Board to consider WTISD's application for assignment to Northern York SD pursuant to the *standards* for organization of school districts. Sections 291 and 293(a) of the School Code inform us that the

---

[17] The Board has also filed an Application to Strike a portion of WTISD's answer to the Board Application, contending that WTISD improperly included the header "New Matter" as an introduction to certain paragraphs of its answer. Though the Board is technically correct that "New Matter" is a designation reserved for pleadings, the designation is not material for purposes of this Court's consideration of the Board Application. Accordingly, we will deny the Board's Application to Strike.

General Assembly directed the Board to adopt *standards* for the organization of school districts based on certain enumerated *factors* and not to approve a school district of less than 4,000 pupils unless the factors enumerated in those sections required approval of such a small district.

In reviewing the Board's actions following remand, we are troubled by the Board's failure below to locate, let alone identify, standards for the creation of school districts despite the General Assembly's directives in the School Code. We would have expected these standards to be found in the Pennsylvania Code. Instead, the Board on remand below directed the hearing officer to follow a 1982 Third Circuit opinion, *Hoots*. *Hoots* addressed challenges to the consolidation of various school districts that resulted in the creation of racially segregated schools. In a footnote, the federal court in *Hoots* refers to Standards for Approval of Administrative Units that were purportedly adopted by the Board. The federal court, citing an exhibit not present in the record before this Court, wrote:

> [T]he State Board adopted Standards for Approval of Administrative Units. These standards provided, *inter alia*, that:
>
>> (a) An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities, and interests of individuals residing in the administrative unit.
>>
>> (b) Consideration should be given to whether a geographic area has developed the characteristics of a community. Community, as used here, includes one or more municipalities and the surrounding territory from where people came for business, social, recreational, fraternal or similar reasons. Neither race or religion shall be a factor in determining administrative unit boundaries and differences in the social and economic level of the

16

population shall not be a basis to determine these boundaries.

. . . .

(c) An administrative unit shall utilize existing buildings to the maximum extent practical avoiding unnecessary new construction where possible.

(d) Pupil population changes may be considered in the planning of administrative units where the changes are supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods.

(e) Consideration shall be given to the capability of providing a comprehensive program of education which shall mean the ability to educate and train each child within his capacity to the extent demanded by the immediate requirements of his growth and his relationship to the strengthening of this Commonwealth and nation, and shall include, but not be limited to, wealth per pupil, qualifications of professional staff, enrollment and diversification of curriculum.

*Hoots*, 672 F.2d at 1111 n.3. It is difficult to discern whether the Third Circuit in *Hoots* paraphrased the supposed standards or included them in the footnote verbatim, and, through the use of the term "*inter alia*," it is clear that the summary or recitation, whichever it may be, is incomplete.

During oral argument in this matter, we raised our concern about the Board's reliance on *Hoots* and the apparent lack of any published standards for evaluating WTISD's application. The Board conceded in its merits brief and during oral argument that it could not locate standards beyond those set forth in *Hoots*. Following oral argument, however, the Board filed the Board Application, claiming that, with the help of a research archivist, the Board located what it claimed to be the applicable standards adopted by the Board, as published in the Pennsylvania

17

Bulletin. 1 Pa. B. 196 (August 22, 1970). Inexplicably, these standards do not appear anywhere in the Pennsylvania Code.

Nonetheless, while WTISD raises numerous objections to the Board Application, WTISD does not dispute the fact that the Board, nearly 50 years ago, published the standards in the Pennsylvania Bulletin. The Pennsylvania Code, the supplements thereto, *and the Pennsylvania Bulletin* serve as "the only legal evidence of the valid and enforceable text" of regulations, statements of policy, or other documents required or authorized to be so published. 45 Pa. C.S. § 901(a). Publication of these Board standards in the Pennsylvania Bulletin "creates a rebuttable presumption that the document was duly issued or promulgated, approved as to legality, and all requirements otherwise met." *Sullivan v. Dep't of Transp., Bureau of Driver Licensing*, 682 A.2d 5, 8 n.4 (Pa. Cmwlth. 1996) (en banc) (citing 45 Pa. C.S. § 905). WTISD does not offer any citation to any subsequent act by the legislature, the Board, or the courts declaring the published standards invalid, repealing them, replacing them, or amending them in any material way.

Accordingly, the Court will grant the Board Application and consider the published standards in the Pennsylvania Bulletin (Board Standards), to the extent applicable, in evaluating the merits of WTISD's appeal of the Board's adjudication.[18] In doing so, we will apply the Board Standards to the reorganized school districts, as proposed in the WTISD application. The question, then, is whether the Board erred in evaluating the question properly before it, that being whether the reconfigured school districts—new Dover SD and new Northern York

---

[18] For ease of reference, we have attached a copy of the Board Standards to this Opinion. In the Board Application, the Board does not seek a remand to afford it the opportunity to reconsider its decision in light of the recently uncovered Board Standards. WTISD opposes any remand for such purpose.

18

SD—meet the applicable statutory and regulatory standards for administrative units.[19]

## B. Analysis of Grounds for Disapproval

The Board Standards addressing school district organization are set forth in Chapters 2-100 (Introduction), 2-200 (Annexation for School Purposes), and 2-300 (Reorganization of School Districts) of the Board's regulations, as published in the August 22, 1970 Pennsylvania Bulletin. Notwithstanding WTISD's arguments to the contrary, the Board Standards address more than the county-wide reorganization of school districts mandated by legislation in the 1960s. As section 2-110 of the Board Standards provides: "The [School Code] carries numerous provisions for school district organization and changes in school district boundaries." The Board regulations reference three types of actions with respect to school district boundaries: (1) annexation; (2) school district reorganization; and (3) "*minor changes in school district boundaries without disturbing municipality boundaries.*" Board Standards § 2-110 (emphasis added).

Using the Board's terminology, this matter involves a *minor change* to school district lines, in that it seeks to relocate an entire municipality from one school district to an immediately adjacent district. We, therefore, look to Chapter 2-300 of the Board Standards.

---

[19] We emphasize here, as we did in *WTISD I*, that the General Assembly, in establishing a mechanism by which petitioning taxpayers could create an independent school district for transfer to an adjoining existing district, created a framework that *required* approval of the creation of the independent school district for transfer purposes and approval of its assignment to the receiving district unless doing so would create new district boundaries that violate the statutory or regulatory standards governing school districts. The General Assembly did not bestow upon the Board a veto power over the judgment of the taxpayers. It also did not empower the Board to weigh the subjective *desirability* of the grant or denial of a transfer. This is not an exercise of discretionary authority within the Board.

## 1. Varying Needs, Aptitudes, Abilities and Interests

Section 2-352(4) of the Board Standards provides: "An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities and interests of individuals residing in the administrative unit."[20] Although phrased as a directive, this standard can be applied in evaluating minor revisions to school district lines. In the context of this matter, then, the Board could consider whether new Dover SD and new Northern York SD will be able to meet this directive.

In addressing this standard, the Board wrote:

> WTISD bears the burden of proving that educational programs and opportunities will be available which satisfy the varying needs, aptitudes, abilities and interests of individuals residing in [Dover SD] and [Northern York SD] after the transfer. WTISD fails to make any substantive arguments for why the transfer will satisfy the varying needs, aptitudes, abilities and interests of individuals residing within both Districts after the transfer. Instead, WTISD essentially argues that because both Districts will be able to offer comprehensive programs of education, both Districts implicitly satisfy this standard. For the reasons stated above however, the anticipated ability to provide comprehensive programs of education is not the equivalent of establishing that the transfer will satisfy the varying needs, aptitudes, abilities and interests of individuals within the Districts.
>
> [Dover SD] contends that WTISD has failed to meet its burden of establishing that the transfer will make available educational programs and opportunities which satisfy the needs, aptitudes, abilities and interests of individuals in both Districts. Although not expressly stated, the underpinnings of [Dover SD's] assertions rest upon the notion that because the programs of instruction within the

---

[20] Administrative unit is another term for school district. An administrative unit is defined as "a geographic area under the control of a single board of school directors." Board Standards § 2-352(1).

20

District are developed and/or approved by the publicly elected Board of School Directors, they necessarily reflect the needs, aptitudes, abilities and interests of the residents within the District. *[Dover SD], therefore, contends that because the transfer will result in [Dover SD] students losing educational and program opportunities they would otherwise continue to have absent the transfer, the transfer will not promote the needs, aptitudes, abilities and interests of the residents within the District.*

The record demonstrates that [Dover SD] provides programs of education different from those offered by [Northern York SD], including the provision of full-day kindergarten. When addressing the anticipated reduction in student population resulting from the transfer, [Dover SD] High School Principal, Jared Wastler, testified that the classes offered by the High School are based upon factors which include the students' graduation requirements, the sequencing of core courses and space availability, particularly [Dover SD's] Career Technology Education Program. Moreover, several courses have set requirements on the grade levels at which the students are able to take the classes. Several of [Dover SD's] four-year educational programs traditionally start their Career Technology Education Program students in ninth grade as an introductory course which forms the foundation upon which subsequent courses are offered. *The record also shows that the transfer would result in [Dover SD] students having reduced educational and extracurricular opportunities. In particular, Mr. Wastler testified that the High School would not be able to offer its current course selection on an annual basis if the number of students fall below the acceptable range due to the loss of students. He additionally established that a loss in student population may also result in Dover High School having to return to providing combination classes wherein two or three different level classes are taught in the same room.*

North Salem Elementary School Principal, Christopher E. Cobb, testified that *the transfer will probably require the North Salem Elementary School to reduce its teaching staff to two teachers per grade level due to the reduction in the number of students*. Mr. Cobb established that the loss of one teacher per grade level would preclude the

21

North Salem Elementary School from departmentalizing its course structure, and would result in North Salem Elementary School reducing the number of its encore teachers and services, such as the reading specialist and learning support teachers.

[Dover SD] Director of Career Education and Academic Services, Charles Benton, testified that *[Dover SD's] philosophy towards its STEM*[21] *program is different from the philosophy of [Northern York SD] which is only STEM[-]oriented.* As an example, the agricultural-based CTE[22] program courses offered by [Dover SD] are different from the STEM courses offered by [Northern York SD] in that they are approved by the Commonwealth of Pennsylvania, are subject to State guidelines and are validated by end-of-program examinations. Further, [Dover SD] provides full-day education at the York County School of Technology, while [Northern York SD] offers half-day technical programs. [Dover SD] Superintendent also highlighted the technology initiatives of [Dover SD], including the provision of iPads to students, which are not being provided by [Northern York SD].

As indicated above, Dr. Claycomb opined that *[Dover SD] High School [s]tudents who transfer to [Northern York SD] could potentially lose access to programs of study in which they currently participate*, including the District's geo-spacial information program, career and technical education program, drop-out re-engagement program, agricultural educational program, and specific pathway programs. *[Dover SD] estimates that it will experience a net loss of approximately $2.3 million in annual revenue (3% of its budget) if the [WTISD] transfer occurs. Dr. Claycomb testified that the anticipated lost revenue to [Dover SD] may result in loss of programs that are currently of value to the local community.*

*WTISD's attempts to counter the foregoing evidence by asserting that [Dover SD] will eventually adapt to the changes in student population and lost revenue, and will*

---

[21] STEM is the acronym for "Science, Technology, Engineering and Math."

[22] CTE is the acronym for "Career and Technical Education."

*overcome the "temporary concerns" created by the transfer.* Despite arguing that academic merit is not a factor for consideration in this matter, WTISD also argues, in part, that "[g]iven that Northern [York SD] is academically superior in every area measured, it is simply not credible to argue that the transfer is going to have a negative impact of [sic] [WTISD s]tudents." WTISD's argument bears little weight in that the breadth of the first *Hoots* standard extends beyond the confines of the effect the transfer will have on students' academic experience. Instead, *Hoots* requires an examination of the needs, aptitudes, abilities and interests of all those residing within [Dover SD]. *For that reason, the potential ability by [Dover SD] to adjust its student population in the years after the merger cannot negate the disruption the transfer will have on the District's existing programs and opportunities which, in turn, reflect the fabric, character and priorities of the residents of [Dover SD]. Accordingly, the evidentiary record addressing the educational programs and opportunities available which meet the varying needs, aptitudes, abilities and interests of individuals residing in [Dover SD] fails to support the transfer by a preponderance of the evidence.*

(Decision at 52-55 (emphasis added) (citations omitted).)

The Board's analysis essentially holds that differences between educational programs offered by the receiving and losing school districts, the anticipated change in Dover SD's programs, and inconvenience to Dover SD as a result of the proposed transfer will result in districts incapable of providing "educational programs and educational opportunities to meet the varying needs, aptitudes, abilities and interests of individuals residing in the administrative unit." *See* Section 2-352(4) of the Board Standards. We must conclude that the Board erred in the manner in which it applied this standard.

It is undisputed that both school districts currently "meet the varying needs, aptitudes, abilities and interests of" their students. There is, however, no evidence or finding by the Board that if WTISD is drawn into Northern York SD, either

23

Northern York SD or Dover SD will be *unable* to meet this directive as a result. Certainly, there is a plethora of evidence, much of it the Board credited, of how the current curricula at Dover SD relating to STEM and vocational-technical training differ from those of Northern York SD. There is also evidence of differences in how the school districts deploy technology to support student learning (Dover SD provides iPads to students). While this evidence shows that some WTISD students will have a different learning experience in Northern York SD, there is no evidence in the record to support any finding or conclusion that WTISD students could not thrive in Northern York SD or, more directly, that Northern York SD cannot and will not "meet the varying needs, aptitudes, abilities and interests of" those students.

There is also credited evidence of how Dover SD may have to alter its *current* curriculum to account for the loss of WTISD students. Indeed, the testimony of Dover SD witnesses shows that Dover SD can, if necessary, adapt. No witness testified that Dover SD cannot make the necessary adjustments and still meet the varying needs, aptitudes, abilities and interests of the students remaining in Dover SD. The Board standards do not require the applying independent school district to establish that the losing school district will be able to preserve every existing program post-transfer. Nor does it require the independent school district to establish that the transfer will impose no inconvenience or disruption on the losing district or its remaining student population. That, however, is how the Board interpreted this particular standard. In that regard, the Board erred. If we allow this error to stand, the mountain that an independent school district would have to climb before the Board would be insurmountable.

In sum, the Board erred as a matter of law in how it applied this particular standard to the WTISD application. Rather than focus on whether both school

24

districts, post-transfer, will be able to "meet the varying needs, aptitudes, abilities and interests of" their new student populations, the Board improperly pitted one district's existing curriculum and offerings against the other's and made inconvenience and disruption to Dover SD the paramount focus of its legal analysis. In reality, even based on the evidence and findings of the Board, we have no doubt that both Northern York SD and Dover SD will be able to meet this Board standard post-transfer, even if they have to adapt their existing programs of instruction and curricula to do so.

## 2. *Community Characteristics*

Section 2-352(7)(c) of the Board Standards provides:

> Consideration should be given to whether a geographic area has developed characteristics of a community. Community, as used here, includes one or more municipalities and the surrounding territory from which people come for business, social, recreational, fraternal or similar reasons. Neither race nor religion shall be a factor in determining administrative unit boundaries and differences in the social and economic level of the population shall not be a basis to determine these boundaries.

In its directions to the hearing officer, the Board asked that the hearing officer hear and consider whether the geographic area of the *new* Northern York SD has developed the characteristics of a community. Implicit in the Board's direction is its view that municipalities will only be approved for transfer if the municipality has an existing community connection to the receiving school district.

In terms of fact finding, the Board found the evidence was insufficient to establish that the new Northern York SD, with WTISD, will reflect the characteristics of the community. It reasoned:

> The evidentiary record on this issue almost exclusively took the form of anecdotal evidence comprising

25

witness[es]' personal preferences rather than the presentation of empirical or statistical evidence. Based upon the testimony provided, each party is found to have presented evidence of equal weight regarding whether the residents of Washington Township most closely identify with the character of the current Dover [SD] boundaries, or with the anticipated character of the community resulting from the transfer. Because WTISD bears the burden of proving by a preponderance of the evidence that Washington Township has developed the character of the community to be formed by the transfer, and because the record fails to establish through substantial evidence that the residents of Washington Township more closely affiliate themselves with the character of the post-transfer community, WTISD has not sufficiently satisfied its burden on this issue in support of the transfer.

(Decision at 56 (citations omitted).)

We again take issue with how the Board has applied one of the statutory and regulatory standards to the minor school district revision sought by WTISD. This particular standard, such as it is, requires only *consideration* of whether *a geographic area* (not a proposed administrative unit) has developed characteristics of a community. The clear concern here was that when the counties proposed new school district lines, in response to the legislative directives in the 1960s to create fewer and larger school districts, they were to pay careful attention to avoid, if at all possible, breaking up communities in the process. Unlike the Board, we do not read this standard as requiring counties to establish through their county plans that each proposed administrative unit enjoys an existing and established community bond. Again, that would be too steep a hill to climb. The counties could, however, draw the administrative units in a way to avoid, as much as possible, breaking up communities.

Properly interpreted, then, the statute and regulation require the Board, in this instance, to consider whether the transfer of WTISD to Northern York SD divides,

26

or breaks up, a community. Considering that we are here evaluating the transfer of an entire municipality from one school district to another, a *minor* revision, this standard is easily met. The Board's regulation defines community as including, *inter alia*, a municipality. Here, Washington Township (by over 70% of its taxpaying residents), a community, has expressed its desire through the petition process authorized by the General Assembly to move its community from Dover SD to Northern York SD. The will of that community cannot be set aside by anecdotal evidence of some residents who oppose the transfer.

We are not discrediting the notion that some in Washington Township have developed a sense of community within Dover SD. That, however, is likely the case in every instance where a municipality invokes the statutory process to move to another school district. Longstanding school district lines create a sense of community. Every petition to establish an independent school district for transfer purposes under the School Code proposes to break up an existing school district. The General Assembly understood this when it passed the legislation. It could not have intended *that* proposed breakup to also be a basis for denying the petition. Yet, that is how the Board has applied the standard in this case. It did so in error.

In short, the Board committed legal error in its application of the community considerations standard. WTISD's application for assignment proposes transfer of an entire community—Washington Township—to Northern York SD. There is no finding by the Board or evidence in the record to suggest that the assignment, if allowed, will result in breaking up some other community. Accordingly, consideration of community characteristics does not warrant denial of the application for assignment of WTISD to Northern York SD.

27

### 3. Use of Existing School Buildings

Section 2-352(7)(e) of the Board Standards provides: "An administrative unit shall utilize existing buildings to the maximum extent practical avoiding unnecessary new construction where possible." The Board, in analyzing this standard, wrote:

> WTISD addresses this standard in its Post-Hearing Brief by asserting that the proposed transfer is anticipated to have a beneficial impact on [Dover SD] by relieving some of the overcrowding experienced by the District. WTISD additionally asserts that "Northern [York SD] will not need any additional new construction . . . ." Although the record supports the argument that a reduction in student population and the construction of its new High School may alleviate current overcrowding within [Dover SD], the record equally shows that the existing infrastructure within [Northern York SD] is inadequate to accommodate the additional students anticipated by the transfer.
>
> Superintendent of Schools, Dr. Eshbach, opined that the transfer of 250-300 students from [Dover SD] to [Northern York SD] would be "significant". Dr. Eric Eshbach's Statement to the [Board], revised March 7, 2018, stated, in part, "To accommodate this anticipated increase in enrollment [approximately 300 students], new classrooms and shared-use space must be added to the existing facilities at the Wellsville Elementary School and the Northern Middle School" in [Northern York SD]. The record shows that the elementary schools within [Northern York SD] are at 80% capacity. However, the addition of students from [WTISD] would increase the capacity of the District's middle school to 93%. Dr. Eshbach qualified the remarks in his report to a small degree at the hearing by testifying that although the addition of students to Wellsville Elementary School will not require additions to the school, it would nevertheless require using current spaces in different capacities and would have an impact on [Northern York SD's] educational program.

28

The record also shows that the Northern York County Policy Manual limits its middle school class size to 28-35 students. For that reason, [Northern York SD] anticipates the need to rapidly renovate its middle school to properly accommodate the additional students it would receive through the transfer of [WTISD] students into the District. Dr. Eshbach established that the addition of students through the transfer of [WTISD] students would cause class size to exceed that range, absent renovations. He also anticipates the need for [Northern York SD] to expand its middle school cafeteria and add or expand some classrooms and common spaces should the transfer occur because the current middle school does not have space to add another teaching team to the building. Dr. Eshbach also testified that, in terms of funding, [Northern York SD] would probably require the suspension of some of the PlanCon rules established by the Commonwealth in order to renovate its middle school in a timely manner. Based on the foregoing evidence, the record fails to establish that the transfer would utilize existing buildings to the maximum extent practical so as to support the proposed transfer.

(Decision at 56-58 (citation omitted).)

As with the standard above relating to communities, this standard seems to be more relevant to the reorganization of school districts mandated by the General Assembly. We note that the standard does not prohibit new construction; rather, it requires school districts to do two things: (1) utilize existing buildings to the maximum extent practical; and (2) avoid *unnecessary* new construction. To the extent this standard can be applied when considering an application for the assignment of independent school districts, as the Board attempted to do, the assignment does not violate the standard.

The evidence and the Board's findings reveal that Northern York SD has the ability to absorb the additional students with limited renovations to and repurposing of existing space at its schools. Through renovations and repurposing, Northern

York SD will be using its existing buildings "to the maximum extent practical," avoiding the construction of new buildings. The Board, therefore, erred in concluding that the transfer would not meet the standard relating to the use of existing buildings.

### *4. Studies of Population Changes*

Section 2-352(7)(b) of the Board Standards provides the following with respect to pupil population changes:

> *Pupil population changes may be considered* in the planning of administrative units when the changes are supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods. Examples of reliable studies of area development are those made by planning commissions, public utility companies and established survey agencies.

(Emphasis added.) Similarly, Section 2-352(7)(g) of the Board Standards provides the following with respect to population changes generally:

> *Population changes may be considered* in the planning of administrative units when the changes are supported by reliable studies of area development showing expansion of the area and by growth projections based on recognized statistical methods. Examples of reliable studies of population growth beyond a normal projection are those made by planning commissions, public utility companies and established survey agencies.

(Emphasis added.)

The Board, in addressing these standards, wrote:

> WTISD advocates for the transfer of [WTISD] students, in part, due to anticipated growth within [Dover SD] which, it contends, will place an enormous strain on the District's resources. In support of that argument, WTISD relies primarily upon the testimony of its expert, Mr. Schoch, and upon observations made by several witnesses from within the community who drove through

30

what was described at the hearing as new residential communities within [Dover SD]. Mr. Schoch opined that [Dover SD's] student population is expected to increase by approximately 3,000 students due to new construction of residential communities over the next ten (10) to twenty (20) years. Accordingly, WTISD argues that the transfer of approximately 250 students from [Dover SD] to [Northern York SD] will alleviate some of the District's overpopulation and, therefore, supports the transfer.

In contrast, [Dover SD] opposes the transfer on economic grounds by challenging Mr. Schoch's contention that [Dover SD] will be able to recover the revenue loss from the transfer through a combination of residential growth within the District and cost containment. Like their arguments that the transfer will degrade the Districts' abilities to provide comprehensive programs of education, [Dover SD] and DAEA argue that the revenue loss from the change in student population due to the transfer will, in turn, result in sufficient diminished educational opportunities for [Dover SD] students to justify the denial of the transfer. The District also asserts that Mr. Schoch failed to present sufficient evidence that the change in student population from the transfer will benefit [Northern York SD].

In its September 14, 2017 correspondence, the Board described this factor as "Whether pupil population changes are supported by reliable studies of area development and demonstrate the desirability of the transfer." The Court in *Hoots* described this factor somewhat differently as permitting consideration of pupil population changes "in the planning of administrative units where the changes are supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods." *Hoots*, 672 F.2d at 1111 n.3. None of the parties have cited to any legal authority, and the [hearing o]fficer is not aware of any such authority which specifically addresses this factor in detail.

In *Hoots v. Commonwealth of Pennsylvania*, 359 F. Supp. 807, 809 (W.D. Pa. 1973)[,] and its progeny however, this factor was addressed in the context of a class action lawsuit which contested plans of reorganization and

31

consolidation of school districts which the plaintiffs contended were racially segregated. *Id.* at 809. Unlike this case where the transfer of approximately 250-300 [WTISD] students is the salient issue, the courts' consideration of this factor in the *Hoots* cases primarily focused upon whether greater demographic shifts favored consolidation, as reflected by past pupil population trends and future population projections. For that reason, the [hearing o]fficer interprets the factor articulated by the Board as calling for a determination of whether greater student population trends in each school district, as shown through reliable studies of area development, support the transfer. Because the arguments advanced by [Dover SD] and DAEA on this issue pertain to the ability by [Dover SD] to continue to provide a comprehensive education to its students after the transfer, and/or the ability of both Districts to provide qualified professional staffs and diversified curricula, they are not materially relevant to this factor but, instead, are more particularly suited to other factors already discussed herein.

WTISD presented evidence of student population trends, to some degree, primarily through Mr. Schoch. Mr. Schoch opined that [Dover SD's] student population is expected to increase by approximately 3,000 students due to new construction over the next ten (10) to twenty (20) years. However, he was unaware of whether Dover Township or Dover Borough has begun the development of new residential properties or whether there are any housing development plans within Washington Township. For that reason, WTISD's evidence regarding current, and/or new development consisted, in large part, of testimony and general observations of lay witnesses who had merely driven through various residential communities in the area. WTISD also relies upon the growth projections over the next 10 to 30 years reflected by the new Dover Township High School's increased capacity of approximately 200 students.

Mr. Schoch did not speak with any members of [Northern York SD] or [Dover SD] as part of his review. Accordingly, Mr. Schoch's analysis regarding [Dover SD's] growth potential was admittedly based upon his review of a Joint Comprehensive Plan/Growth

Management Plan for Dover Borough/Dover Township Region developed approximately ten years ago, in January 2008. Mr. Schoch conceded that although the Comprehensive Plan set forth 20-year growth projections using 2006 statistics, the projections within the plan have not come to fruition in the 10 years since the Plan's creation. Notably, he has not conducted a similar analysis of residential growth or building capacity in [Northern York SD]. For that reason, the record on this issue comprises mostly of speculative student population growth estimates from residential housing units, without knowing how many students per house, if any, will exist, or if and when the developments will achieve build-out. Although he had conducted an analysis of [Dover SD's] population projections based, in part, upon the York County Planning Commission's population projections, Mr. Schoch admitted to not having conducted a similar analysis for [Northern York SD]. Nor has he made similar projections for [Northern York SD]. *Upon consideration of the foregoing, the [hearing o]fficer finds that the growth projections offered by the WTISD on the basis of possible residential development and the capacity increase of the High School of 200 students over the next 10 to 30 years are too speculative to constitute a preponderance of the evidence that the transfer is desirable based upon anticipated pupil population changes, as shown through reliable studies of area development and future projections.*

(Decision at 58-61 (emphasis added) (citations omitted).)

We agree with WTISD that the Board erred as a matter of law in how it applied these standards to the application for assignment. Importantly, there is nothing in the Board Standards that *requires* an independent school district for transfer purposes to prove, by population studies, the "desirability" of the application for assignment. It was clear error by the Board to impose such a nonexistent burden on WTISD. Rather, the population studies standards, like other standards in the Board Standards, appear to be linked to legislative directives in the 1960s to create larger and fewer school districts in the Commonwealth, with a 4,000 pupil average daily

33

membership goal per district, at a minimum. As part of the reorganization, a county board of school directors *could* use "reliable studies" to justify its proposed plan of reorganization and how the plan satisfies that statutory pupil population standard.

To the extent this standard could be applied in this situation—a minor revision to existing district lines to transfer an entire municipality to an adjacent school district—the standard would likely only come into play if the proposed transfer of an entire municipality would, from a population perspective, dramatically and materially alter pupil populations in the losing and receiving school districts. The proposed transfer of students cannot overwhelm a receiving district with pupils it cannot reasonably accommodate nor result in the losing district becoming so small that it cannot reasonably operate at the time of transfer or for a reasonable period into the future, taking into consideration anticipated increases or decreases in pupil population.

Neither the evidence nor the Board's findings support such a dramatic and material shift of student population in this matter. Both Northern York SD and Dover SD currently have fewer than 4,000 pupils (between 3,000 and 3,500 students),[23] meaning both are already below the statutory minimum threshold. That

---

[23] Dover SD is the larger of the two. For the 2016-2017 school year, Dover SD's enrollment was 3,499 students. (C.R., Hearing Exhibits, at 000046.) Northern York SD's enrollment for that school year was 3,192 students. (*Id.* at 000052.) These numbers are in accord with enrollment data maintained by the Pennsylvania Department of Education (Department), https://www.education.pa.gov/Documents/Data%20and%20Statistics/Enrollment/Enrollment%20Projections/School%20District%20Enrollment%20Projections.pdf (last visited June 4, 2020). For the 2018-2019 school year, the last school year reported by the Department, Northern York SD's student population was 3,224. Dover SD's student population was 3,516. Roughly speaking, then, the transfer of WTISD to Northern York SD will yield redrawn school districts that are roughly equal in size from a pupil population perspective.

will not change if the Board approves the application for assignment.[24] The shift of student population would be approximately 250 pupils to Northern York SD, or roughly 7% of the Dover SD student population. As noted above, the Board's findings and the evidence support the conclusion that Northern York SD is capable of absorbing the additional student population.

Dover SD presses its concern over the financial impact of the transfer. According to its Business Manager, Ms. Benko, the loss of revenue to Dover SD resulting from the transfer could be approximately $2.3 million. (Board Finding of Fact (FF) # 93.) According to Mr. Schoch, this loss of revenue is approximately 3% of Dover SD's annual budget of approximately $75 million. (FF ## 21, 22.) Ms. Benko further testified that Dover SD anticipates the need to increase property taxes, furlough professional employees and staff, and modify curriculum if the transfer is approved. (FF ## 96, 100.) Nonetheless, Ms. Benko testified, and the Board found, that Dover SD "has not . . . conducted a comprehensive analysis of ways to reduce expenses following the transfer." (FF # 96.)

Every transfer of a municipality from one school district to another will have a financial impact on both the receiving and losing districts. The General Assembly acknowledges this in the School Code, requiring the court of common pleas, in its decree establishing an independent school district for transfer purposes, to "determine the amount, if any, of the indebtedness and obligations of the school district, from whose territory such independent district is taken, that said district shall assume and pay, and, a statement prorating the State subsidies payable between or

---

[24] It is for this reason that we reject DAEA's contention that the proposed transfer "would result" in school districts with disfavored pupil populations—*i.e.*, below 4,000 students. These school districts are already below the preferred minimum threshold for student population.

35

among the losing district or districts and the receiving district." Section 242.1(a) of the School Code. What the testimony and fact finding by the Board show is that Dover SD may face some difficult business choices as a result of the transfer. Dover SD does, however, have choices. In other words, there is no evidence in the record, or finding by the Board, that Dover SD cannot weather the financial consequences of the transfer. Indeed, as we have noted above, the evidence of record and the Board findings show indisputably that Dover SD and Northern York SD can adapt, academically and financially, to the transfer and still meet the standards for school districts under the School Code and the Board's regulations.

In short, the Board's factual findings and the evidence of record establish that, from a pupil population perspective, the transfer of WTISD from Dover SD will not overwhelm Northern York SD with students that it cannot reasonably accommodate nor result in Dover SD being reduced to such a size that it cannot reasonably operate after the transfer. The Board, therefore, erred in concluding that the transfer would violate standards relating to pupil population.

## C. Effective Date

Northern York SD has remained neutral on the merits of both the original petition to establish WTISD for transfer purposes and the application for approval of the assignment of WTISD to Northern York SD. Its paramount and laudable focus has been on securing a reasonable transition period with oversight to provide a comprehensive program of education to its current students while planning to do the same for its future students.

Section 226 of the School Code, 24 P.S. § 2-226, provides the following with respect to transition:

> If any new school district is made by the creation of
> any . . . independent school district, . . . or if the boundary

36

lines of any school district are changed, by reason of the changing boundary lines of any . . . independent school district, then, in any such case, the change, so far as it relates to school districts or school affairs, shall take effect at the beginning of the *first school year after such . . . independent school district has been created . . . or such change in boundary lines permanently affected.*

(Emphasis added.) The common pleas court created WTISD for transfer purposes in November 2014. We cannot make the new boundaries retroactively effective to the 2015-2016 school year. The fallback, then, is the first school year after such change in boundary lines is permanently affected.

We agree with Northern York SD that a reasonable period of transition is necessary, particularly because both districts have been operating under a period of uncertainty over the last five years while this matter has been slowly making its way through the common pleas court, the Secretary, the Board, and now this Court. Both school districts must have a reasonable period of time to plan academically and financially for their new student populations.

Accordingly, and consistent with governing law, we will remand this matter to the Board with direction that it make revisions to the York County plan of organization of school districts to reflect the assignment of WTISD to Northern York SD *effective with the 2021-2022 school year.*[25] The Board should then transfer the

---

[25] The COVID-19 pandemic has placed a tremendous stress on our school districts and students. Effective March 16, 2020, Governor Tom Wolf indefinitely suspended in-class instruction at brick and mortar schools throughout the Commonwealth. On April 9, 2020, he extended the school closure order for the remainder of the 2019-2020 school year. School districts have moved to distance learning platforms in an effort to educate their student populations and complete the academic year, and extracurricular activities and interscholastic athletic competitions have been cancelled. With lingering uncertainty as to when these and other COVID-19 precautions will be lifted, an effective date of the 2020-2021 academic year will place too much stress on already burdened school districts as they attempt to manage the remainder of this academic year and plan (hopefully) to return to some sense of normalcy next school year.

matter back to the common pleas court to oversee the implementation of the reassignment. In particular, but without limitation, the common pleas court must "determine the amount . . . of indebtedness and obligations of [Dover SD], [if any, that Northern York SD] shall assume and pay, and, a statement prorating the State subsidies payable between or among [Dover SD] and [Northern York SD]." Section 242.1(a) of the School Code.

## V. CONCLUSION

For the reasons set forth above, the Board erred in its evaluation of the standards for the organization of school districts set forth in the School Code and the Board's regulations as applied to the application for approval of the assignment of WTISD to Northern York SD. As neither the Board's fact finding nor the evidence of record show that the assignment will result in school districts that do not meet statutory and Board standards for administrative units, we will reverse the Board's decision denying the application and remand the matter to the Board for further proceedings consistent with this Opinion.

_____
P. KEVIN BROBSON, Judge

Judges Cohn Jubelirer and Fizzano Cannon did not participate in the decision of this case.

38

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Washington Township Independent :
School District, :
                    Petitioner :
                               :
        v. : No. 142 C.D. 2019
                               :
Pennsylvania State Board of Education, :
                    Respondent :

**O R D E R**

AND NOW, this 4th day of June, 2020, the order of the Pennsylvania State Board of Education (Board), dated January 10, 2019, is REVERSED. This matter is REMANDED to the Board for further action in accordance with the accompanying Opinion.

The Board's Application for Leave to File Post-Submission Communication Pursuant to Pa. R.A.P. 2501(a) is GRANTED. The Board's Application to Strike is DENIED.

        Jurisdiction relinquished.

_____
P. KEVIN BROBSON, Judge

# Rules and Regulations

## Title 22—EDUCATION

### DEPARTMENT OF EDUCATION

### STATE BOARD OF EDUCATION

**Establishment and Organization of Intermediate Units to Replace County Superintendencies and County Boards of School Directors.**

#### 14-100. Introduction.

This regulation is based on the Act of May 4, 1970 (Act No. 102), P.L. __, 24, P.S. §9-951, which establishes a system of intermediate units to replace the county superintendency and the county board of school directors.

14-110. *Establishment.* Intermediate units shall be established, approved and operated in accordance with the Public School Code of 1949, as amended, the regulations of the State Board of Education and the standards and guidelines of the Secretary of Education.

#### 14-200. Organization of the Intermediate Unit.

14-210. *Conventions.* Pursuant to the provisions of the act, the Secretary of Education shall set the date, time and place and, through the facilities of the secretary of each school board within each intermediate unit, call a convention of all school directors in each intermediate unit for the purpose of an initial election of an intermediate unit board of directors. Subsequent elections will be at the call of the executive director of the unit.

The Secretary of Education shall designate a chairman for each initial convention and may designate from among the county superintendents and their staffs a board of tellers and other officers of the initial convention.

The Secretary of Education shall prepare guidelines based on law and these regulations for the conduct of the initial election of the intermediate unit board of directors.

14-220. *Election of Intermediate Unit Boards; Terms.* Nominations for the office of intermediate unit board of directors, for terms to begin January 15, 1971, shall be made from the floor of the convention by individual school directors. Nominating committees may be utilized to prepare the slate of candidates.

At least 13 nominations shall be placed before the convention.

School directors duly in office at the time of the convention shall be eligible to be nominated and elected to the intermediate unit board and to vote at the convention.

Voting at the initial election shall be by signed ballot on forms provided by the Secretary of Education.

The ballot used at the initial election, to represent a valid vote, shall indicate on its face the proportionate number of votes the director is entitled to cast and the name of his school district.

Each school director of each school board within an intermediate unit shall be entitled to cast a proportionate vote, such proportionate vote to be computed in accordance with the formula specified in the act from the latest data available to the Secretary of Education.

Votes shall be cast as individual board members and not as a school board vote.

Absentee voting, splitting of proportionate votes and cumulative voting shall be prohibited.

In the event a school director shall cast duplicate votes for a candidate, his proportionate vote shall be counted for that candidate but once.

The 13 school directors receiving the highest number of proportionate votes cast by the directors present and voting shall be declared elected, provided the limitations as to number per district, as outlined in Section 910-A of the Public School Code, shall be applied.

Ties shall be broken by drawing of lots.

The terms of office of the intermediate unit directors selected at the initial election of the intermediate unit board shall be determined by a drawing of lots.

14-230. *Minutes of a Convention.* The chairman of each convention shall, five days after the convention, file with the Secretary of Education a complete report on the convention.

14-240. *Planning Committee; Officers.* The intermediate unit board of directors selected at the initial election shall serve, until July 1, 1971, as the intermediate unit planning committee. On July 1, 1971, the planning committee shall assume office as the intermediate unit board of directors.

14-250. *Name and Number.* The number of the intermediate unit shall be as designated in the act.

The planning committee shall select a name for its intermediate unit and file same with the Secretary of Education. If the Secretary of Education finds no duplication of name previously approved, he shall issue a certificate indicating that the approved name has been registered as the official designation of the intermediate unit.

14-300. **Executive Director and Assistant Executive Director.**

14-310. *Selection; Term.* The planning committee shall, as soon as practicable, name an executive director-elect for a term beginning July 1, 1971, and ending June 30, 1974, and set his salary, and may, as the business of the intermediate unit may require, name assistant executive directors as provided in the act.

14-320. *Qualifications of the Executive Director.* Candidates for the office of executive director, for the term ending June 30, 1974, shall be required to (1) possess a valid Letter of Eligibility or an active commission as district or county superintendent, or (2) be currently holding an active commission for the office of county superintendent or assistant county superintendent for the commission term which began July 1, 1966.

14-330. *Qualifications for Assistant Executive Director.* Candidates for selection to the post of assistant executive director, for the term ending June 30, 1974, shall be required to (1) hold a valid Letter of Eligibility for the positions of county or district, assistant county or district superintendent or (2) be currently holding an active commission as county or assistant county superintendent for the commission term which began July 1, 1966.

Dated: July 17, 1970

SEVERINO STEFANON,
*Secretary*

[Pa. B. Doc. No. 70-182. Filed August 21, 1970, 9:00 a.m.]

### School District Organization

2-100. Introduction
  2-110. Statutory References
  2-120. General Provisions
2-200. Annexation for School Purposes
  2-210. Conditions for Approval of Annexations
2-300. Reorganization of School Districts
  2-310. Methods of Unification
  2-320. Approval of Joint Schools or Departments
  2-330. Combination of Administrative Units
  2-340. Independent Districts for Transfer
  2-350. County Plans of Administrative Units
    2-351. Delimitations
    2-352. Standards for Approval
    2-353. Approvals
    2-354. Procedures
    2-355. Appeals

#### 2-100. Introduction.

2-110. *Statutory References.* The Public School Code (Act of March 10, 1949, P.L. 30, 24 P.S. §§1.102 *et seq.*) carries numerous provisions for school district organization and changes in school district boundaries as follows:

In annexation for school purposes, the State Board of Education's responsibilities are found in provisions of Article II, §226 through 229 (24 P.S. §§2-226-2.229) and 271 through 277 (24 P.S. §§2-271-2-277).

School district reorganization authority, as it applies to joint schools, is found in Article XVII of the Public School Code. Section 224 (24 P.S. §2-224) specifically deals with State Board approval of further reorganization of administrative units and/or school districts reorganized under Acts 299, 1963 (24 P.S. §§2-290 *et seq.*) and 150, 1968 (24 P.S. §§2400.1-2400.10).

To make minor changes in school district boundaries without disturbing municipal boundaries, §242.1 (24 P.S. §2-242.1) applies and provides for State Board of Education approval.

2-120. *General Provisions.* All aspects of the changing of school district boundaries must comply with the School Laws of Pennsylvania, the State Board of Education regulations, and have prior review and recommendations by the Department of Education. This applies to annexations which alter school district boundaries, combinations of school districts into larger units and creation of independent districts for transfer purposes only.

The Department of Education shall establish procedures, conduct investigations, require forms, data and reports necessary to carry out the above provisions.

## 2-200. Annexation for School Purposes.

2-210. *Conditions for Approval of Annexations.* Changes in the boundaries of school districts, to coincide with changes in municipal boundaries already made, will be approved by the Council of Basic Education, in original applications, unless:

(1) The change would seriously impair the educational program of either the losing school district or the annexing school district.

(2) The loss to the losing school district in assessed valuation and tax income would impair the ability of the residual area to amortize existing debts or support its educational program.

(3) Approval would impose an undue transportation inconvenience on the pupils of the annexed area.

The State Board of Education, when considering an annexation appeal taken from a decision of the Council of Basic Education, may make its determination upon the basis of evidence presented at the hearing before the Council of Basic Education committee and any supplemental briefs or materials it may authorize or require.

The Council of Basic Education and the State Board of Education, as the case might be, reserve the discretionary right, prior to any action, to advise all school districts concerned in the annexation, that a just and proper adjustment of property, real and personal, including funds, indebtedness and rental obligations, if any, shall be made to and among the school districts, as prescribed in Sections 271 through 277 of the Public School Code.

## 2-300. Reorganization of School Districts.

2-310. *Methods of Unification.* There are 3 basic methods in the Public School Code of 1949, as amended, for the unification or contracted co-operation of school districts:

(1) Any 2 or more school districts may sign contractual agreement to form a joint board for the operation of the schools of a joint school system or for the combined operation of departments.

(2) Any two or more administrative units or resultant school districts may combine to create a larger school district.

(3) The mandatory combination of school districts within approved county plans of administrative units (Act 299, 1963 and Act 150, 1968).

2-320. *Approval of Joint Schools or Departments.* Pursuant to Article XVII of the Public School Code, the State Board of Education provides that:

(1) The Department of Education may grant approval for the establishment of joint departments to operate special education programs.

(2) The Department of Education may approve joint vocational-technical boards to operate such schools as are in compliance with the State Board for Vocational Education's state plan for vocational-technical education.

(3) The Department of Education may grant approval to establish or enlarge a joint board for the operation of a joint school, K-12, only in those situations where application of Section 224 of the Public School Code would result in an undue financial burden on the participating school districts.

2-330. *Combination of Administrative Units.* The State Board of Education will approve the combination of any two or more contiguous reorganized school districts or approved administrative units if all conditions of Section 224 of the Public School Code have been satisfied and no appeal has been filed or, after an appeal, if such combination is deemed in the best interest of the school system of the State and the locality.

2-340. *Independent Districts for Transfer.* In situations where a small area of a school district petitions for transfer from one school district to another, the State Board of Education will approve the creation of such independent district for transfer purposes only if in the opinion of the Secretary of Education such transfer will be advantageous from an educational point of view.

2-350. *County Plans of Administrative Units.* The School District Reorganization Act of 1968, Act 150, approved July 8, 1968 directs the State Board of Education within 30 days of the effective date of the act, to adopt standards for approval of administrative units comprised of those school districts which are not in an administrative unit established as a school district under Section 296 of the Act of March 10, 1949, P.L. 30, as amended.

The plans of administrative units prepared by county boards of school directors under the provisions of Act 150, the Act of July 8, 1968 shall conform to the following standards and exceptions adopted by the State Board of Education on July 11, 1968.

2-351. *Delimitations.* The plans of administrative units submitted under this act shall be limited to those school districts which are in administrative units that have not established under the provisions of Act 299, the act of August 8, 1963.

Exception: One or more school districts established under the provisions of Act 299, may be included in an administrative unit planned under this act only if the school district established under Act 299 agrees to the assignment.

2-352. *Standards for Approval.*

(1) An administrative unit shall be defined as a geographic area under the control of a single board of school directors.

(2) An administrative unit shall be planned as a contiguous geographic area. Exceptions to contiguity may be made only in situations where the administrative unit in whole or in part includes a noncontiguous geographic area which had been previously approved by the State Board of Education as an administrative unit or had operated as an administrative unit, a school district or joint school system during the 1967-1968 school year.

(3) An administrative unit shall be planned to offer a full program of instruction, kindergarten or grade one through 12, and provide administrative leadership, supervision and instruction at a reasonable cost consistent with the local taxable wealth and state financial support available per pupil.

(4) An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities and interests of individuals residing in the administrative unit.

(5) An administrative unit shall embrace one or more secondary attendance centers and supporting elementary attendance centers.

(6) An administrative unit shall be planned to include the largest feasible pupil population which assures the maximum efficiency of operation, and which justifies curricular offerings and other essential services not economically possible in smaller administrative units.

(7) An administrative unit meeting or exceeding the mandated 4,000 pupil average daily membership as determined for the 1966-1967 school year and any administrative unit proposing a reduction of the mandated minimum pupil population shall be planned with consideration of, but not limited to, the following factors:

(a) *Topography.* An administrative unit shall be planned so that all parts of the unit are reasonably accessible for effecient operation and supervision.

(b) *Pupil Population.* Pupil population changes may be considered in the planning of administrative units when the changes are supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods. Examples of reliable studies of area development are those made by planning commissions, public utility companies and established survey agencies.

(c) *Community Characteristics.* Consideration should be given to whether a geographic area has developed characteristics of a community. Community, as used here, includes one or more municipalities and the surrounding territory from which people come for business, social, recreational, fraternal or similar reasons. Neither race nor religion shall be a factor in determining administrative unit boundaries and differences in the social and economic level of the population shall not be a basis to determine these boundaries.

(d) *Transportation of Pupils.* Distances traveled, travel conditions, time consumed, and the safety and general welfare of the pupils should be basic considerations in developing administrative units. Planning of transportation systems should avoid duplication and, insofar as practical, the transportation of pupils through the area of an adjacent administrative unit.

(e) *Use of Existing School Buildings.* An administrative unit shall utilize existing buildings to the maximum extent practical avoiding unnecessary new construction where possible.

(f) *Existing Administrative Units.* No part of an existing school district may be separated and added to another administrative unit, except as provided in Act 383, approved December 19, 1967 or as provided in the annexation laws. Administrative units already established as school districts under Act 299 may be included in administrative units planned under this act only if the existing school district so established grants consent.

(g) *Potential Population Changes.* Population changes may be considered in the planning of administrative units when the changes are supported by reliable studies of area development showing expansion of the area and by growth projections based on recognized statistical methods. Examples of reliable studies of population growth beyond a normal projection are those made by planning commissions, public utility companies and established survey agencies.

(h) *Capability of Providing a Comprehensive Program of Education.* For purposes of reorganization planning, "capability of providing a comprehensive program of education" shall mean: The ability to educate and train each child within his capacity to the extent demanded by the immediate requirements of his growth and his relationship to the strengthening of this Commonwealth and nation, and shall include, but not be limited to, wealth per pupil, qualifications of professional staff, enrollment and diversification of curricula.

(8) County plans shall provide for the inclusion of all the area within a county, unorganized as stated above, into one or more administrative units and, with the concurrence of the county board or boards of school directors of an adjacent county or counties, may include contiguous area across county lines. School districts established under the provisions of Act 299 may be included in a planned administrative unit of the plan if the school district so established grants consent.

2-353. *Approvals.*

(1) The State Board of Education shall review all plans and approve such plans as it deems wise in the best interest of the educational system of the Commonwealth.

Exception: If no petition of appeal is filed by a school district, considering itself aggrieved by the plan as submitted by the county board of school directors, within thirty days after submission of the plan, the plan shall be deemed approved by the State Board of Education without further right of appeal.

2-354. *Procedures.*

(1) The county plan of administrative units submitted under Act 150 shall be limited to those school districts which are not in an administrative unit that established under Act 299, the act approved August 8, 1963 except as otherwise provided in this act.

(2) The plan may include one or more school districts established under Act 299 if the school district so established agrees to the placement.

(3) In the event that county boards had previously adopted resolutions transferring a school district or school districts from one county to the educational jurisdiction of another, such resolutions need not be renewed. However, if such transfers are to be rescinded or additional transfers are to be made in the current plan of administrative units, resolutions to this effect shall be adopted by each county board affected and shall accompany the plan to the State Board of Education.

(4) The plan of administrative units shall conform to the standards for approval of administrative units adopted by the State Board of Education.

(5) In preparing its plan, the county board of school directors shall confer with the school boards of each school district to be assigned to an administrative unit of the plan.

(6) Completed plans shall be submitted to the State Board of Education *within ninety days* of the effective date of this act and *not more than thirty days* after the plan is adopted by the county board.

Note: Plans can and should be forwarded to the State Board of Education immediately upon adoption by the county board of school directors.

(7) Plans shall be submitted on forms provided by the State Board of Education and containing such data and other information as requested thereon.

(8) County boards of school directors shall, immediately upon adoption of the plan, notify the secretary of each school board of the school district's assignment to the plan together with the date of submission of the plan to the State Board of Education. It appears advisable that notices should be sent by registered or certified mail.

2-355. *Appeals.*

(1) A school district considering itself aggrieved by the plan of organization of administrative units adopted by the county board of school directors may petition the State Board of Education for a hearing setting forth the basis for such appeal.

(2) Appeal petitions shall be filed *within thirty days* of the date of submission of the plan to the State Board of Education by the county board of school directors.

(3) The State Board of Education, upon receipt of an appeal petition, shall fix the date, time and place for a hearing.

(4) Three or more members of the State Board of Education shall constitute the State Board for hearing purposes.

(5) The State Board of Education may hear and consider such testimony as it may deem advisable to enable it to make a decision.

(6) After reaching a decision, the State Board of Education shall enter such order as appears, either approving the plan as submitted by the county board or approving the plan in an amended form.

(7) If no appeal petition is filed within thirty days of the date of submission of the plan by the county board of school directors, the plan of administrative units, as submitted, shall be deemed approved by the State Board of Education without right of appeal.

(8) A school district considering itself aggrieved by the plan of administrative units approved by the State Board of Education, except those plans against which no petitions of appeals had been filed, may, within thirty days of the date of approval by the State Board, appeal to the Court of Common Pleas of the county in which the school district is located.

Dated: July 17, 1970

SEVERINO STEFANON,
*Secretary*

[Pa. B. Doc. No. 70-183. Filed August 21, 1970, 9:00 a.m.]

# Title 55—PUBLIC WELFARE

## DEPARTMENT OF PUBLIC WELFARE

## Application Procedures for Medical Assistance

## Procedure in Determining Eligibility for Inpatient Hospital Care

Pursuant to Act of June 13, 1967, P.L. 31, Article IV, 62 P.S. §§101 *et seq.* the Department of Public Welfare hereby adopts the following:

PA Manual Sections:
9315.31
9315.32
9315.4
9315.5
9315.6
9315.62
9315.7
9315.71
9421.34

9315.31. *PA 5-A.* The PA 5-A is issued initially by the County Assistance Office under the conditions stated below:

a. *For Money Payment Recipients* (OAA, AD, ADC, GA and FSBP). The County Office issues the PA 5-A on the date the PA 122 is signed for the current calendar quarter. The Central Office reissues the PA 5-A for the quarter following that in which eligibility was initially determined and for each quarter thereafter, as long as a money grant is made.

However, when the person is not on the rolls for the payment date in the first half of the month that ends the previous quarter (i.e. March payment day numbers 1 to 10 inclusive for the first calendar quarter), the County Office, in addition to issuing the PA 5-A for the current quarter, issues the PA 5-A for the following quarter. The above applies to persons receiving NHC who are not on the rolls for the payment date in the month preceding the end of each quarter (i.e. March 9 for the first calendar quarter). In such instances, the Central Office will reissue the PA 5-A for the second quarter following that in which eligibility was initially determined and thereafter, as long as a money grant is made.

For FSBP receipients, the principles stated in 9315.32 apply to the initial issuance of the PA 5-A.

The PA 5-A is issued to the payment name for the grant group.

b. *For Categorically Needy Non-Money Payment Recipients.*

9315.32. *PA 5-B.* The PA 5-B is issued initially by the County Office on the date the PA 122 authorizing SBP is signed for the current calendar quarter. The Central Office will reissue the PA 5-B for the quarter following that in which eligibility was initially determined and for each quarter thereafter, as long as a money payment is made.

However, when the person is not on the rolls for the payment date in the month preceding the end of each quarter (i.e., February 29th for the first calendar quarter), the County Office, in addition to issuing the PA 5-B for the current quarter, issues the PA 5-B for the following calendar quarter. In these instances, the Central Office will reissue the PA 5-B for the second quarter following that in which eligibility was initially determined and for each quarter thereafter, as long as a money payment is made.

9315.4. *Physician's Prescription, PA 4-M.* The PA 4-M is used by the physician to prescribe the following services:

a. Hospital-home care

b. Private Nursing home care

c. Public nursing home care

d. Visiting nurse service

It is required for each request for each request for such service or change in type of service for both the categorically and medically needy only, and is signed by the physician or person delegated to sign for him.

The County Office gives a supply of the prescription form to physicians, visiting nurse associations, hospitals, nursing homes and county authorities.

9315.5. *Hospital Admission Certification, PA 6-M.* The PA 6-M is used by the hospital to notify the County Assistance Office that the person named has been admitted to the hospital and the date of the admission. It is required for each patient for whom an MA payment for inpatient hospital care is requested.

The PA 6-M also shows whether the hospitalization of the patient was due to an accident or occupational injury.

9315.6. *Notice to Applicant or Recipient.* The PA 162 and PA 162-C are the primary methods of notification to an applicant or recipient of the decision of the County Office concerning his eligibility.

The PA 162 and PA 162-C should usually suffice; however, if either should be inadequate, a letter may be used instead. If a letter is used, it must contain a statement of the decision, the reasons for the decision, and the applicant's or recipient's right to ask for and have a State Office hearing if he is dissatisfied with the decision or feels that he has been treated unfairly.

9315.62. *PA 162-C.* The PA 162-C is used to notify a recipient of the decision of the County Office when a change in his eligibility occurs after a redetermination.

9315.7. *Certification — Inpatient Hospital Care, Hospital-Home Care, Nursing Home Care, PA 5-M.*

NOTE: When payment is requested for nursing home care, copies of the PA 5-M are sent to the person and the vendor only.

The PA 5-M is the written notice of the decision of the person's eligibility for MA payment for inpatient hospital care, hospital-home care, or private nursing home care and, if appropriate, the number of benefit days available to him. It is prepared for both the categorically needy and medically needy only (1) at the time the person is planning the service or it is being received, or (2) to correct a previous PA 5-M if conclusive evidence is presented that the information available about the person's circumstances at the time service was received was inaccurate or incomplete.

If application is made at the same time a specific service is being received, the PA 5-M is sent with the PA 162 to the applicant.